[Civ. No. 45149. First Dist., Div. One. Feb. 27, 1981.]

WAYNE K. PUGH, Plaintiff and Appellant, v.
SEE'S CANDIES, INC., et al., Defendants and Respondents.

COUNSEL

Joseph P. Stretch for Plaintiff and Appellant.

Donald F. Farbstein, Farbstein, Brown & Pillsbury, Phillip J. Smith and Smith, Clancy, Wright & Laws for Defendants and Respondents.

OPINION

**GRODIN, J.**—After 32 years of employment with See's Candies, Inc., in which he worked his way up the corporate ladder from dishwasher to vice president in charge of production and member of the board of directors, Wayne Pugh was fired. Asserting that he had been fired in breach of contract and for reasons which offend public policy he sued his former employer seeking compensatory and punitive damages for wrongful termination, and joined as a defendant a labor organization which, he alleged, had conspired in or induced the wrongful conduct. The case went to trial before a jury, and upon conclusion of the plaintiff's case-in-chief the trial court granted defendants' motions for nonsuit, and this appeal followed.

*Standard of Review on Nonsuit*

Under established principles, a nonsuit may be granted "'only where, disregarding conflicting evidence on behalf of the defendants and giving to plaintiff's evidence all the value to which it is legally entitled, therein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff.'" (*O'Keefe* v. *South End Rowing Club* (1966) 64 Cal.2d 729, 733 [51 Cal.Rptr. 534, 414 P.2d 830, 16 A.L.R.3d 1]; see also *Dailey* v. *Los Angeles Unified Sch. Dist.* (1970) 2 Cal.3d 741, 745 [87 Cal.Rptr. 376, 470 P.2d 360].) Applying these principles, we conclude that the trial court erred in granting the nonsuit motions, and reverse.

SUMMARY OF THE EVIDENCE

We summarize the evidence presented to the jury. The defendant employer is in the business of manufacturing fresh candy at its plants in

Los Angeles and South San Francisco and marketing the candy through its own retail outlets. The South San Francisco plant is operated under the name See's Candies, Inc., a wholly owned subsidiary corporation of See's Candy Shops, Inc., which operates the Los Angeles plant as well. The stock of See's Candy Shops, Inc., was held by members of the See family until 1972, when it was sold to Blue Chip Stamps Corporation. For convenience, the designation "See's" will be used to refer to both companies.

Pugh began working for See's at its Bay Area plant (then in San Francisco) in January 1941 washing pots and pans. From there he was promoted to candy maker, and held that position until the early part of 1942, when he entered the Air Corps. Upon his discharge in 1946 he returned to See's and his former position. After a year he was promoted to the position of production manager in charge of personnel, ordering raw materials, and supervising the production of candy. When, in 1950, See's moved into a larger plant in San Francisco, Pugh had responsibility for laying out the design of the plant, taking bids, and assisting in the construction. While working at this plant, Pugh sought to increase his value to the company by taking three years of night classes in plant layout, economics, and business law. When See's moved its San Francisco plant to its present location in South San Francisco in 1957, Pugh was given responsibilities for the new location similar to those which he undertook in 1950. By this time See's business and its number of production employees had increased substantially, and a new position of assistant production manager was created under Pugh's supervision.

In 1971 Pugh was again promoted, this time as vice president in charge of production and was placed upon the board of directors of See's northern California subsidiary, "in recognition of his accomplishments." In 1972 he received a gold watch from See's "in appreciation of 31 years of loyal service."

In May 1973 Pugh travelled with Charles Huggins, then president of See's, and their respective families to Europe on a business trip to visit candy manufacturers and to inspect new equipment. Mr. Huggins returned in early June to attend a board of director's meeting while Pugh and his family remained in Europe on a planned vacation.

Upon Pugh's return from Europe on Sunday, June 25, 1973, he received a message directing him to fly to Los Angeles the next day and meet with Mr. Huggins.

Pugh went to Los Angeles expecting to be told of another promotion. The preceding Christmas season had been the most successful in See's history, the Valentine's Day holiday of 1973 set a new sales record for See's, and the March 1973 edition of See's Newsletter, containing two pictures of Pugh, carried congratulations on the increased production.

Instead, upon Pugh's arrival at Mr. Huggin's office, the latter said, "Wayne, come in and sit down. We might as well get right to the point. I have decided your services are no longer required by See's Candies. Read this and sign it." Huggins handed him a letter confirming his termination and directing him to remove that day "only personal papers and possessions from your office," but "absolutely no records, formulas or other material"; and to turn in and account for "all keys, credit cards, et cetera." The letter advised that Pugh would receive unpaid salary, bonuses and accrued vacation through that date, and the full amount of his profit sharing account, but "No severance pay will be granted." Finally, Pugh was directed "not to visit or contact Production Department employees while they are on the job."

The letter contained no reason for Pugh's termination. When Pugh asked Huggins for a reason, he was told only that he should "look deep within [him]self" to find the answer, that "Things were said by people in the trade that have come back to us." Pugh's termination was subsequently announced to the industry in a letter which, again, stated no reasons.

When Pugh first went to work for See's, Ed Peck, then president and general manager, frequently told him: "if you are loyal to [See's] and do a good job, your future is secure." Laurance See, who became president of the company in 1951 and served in that capacity until his death in 1969, had a practice of not terminating administrative personnel except for good cause, and this practice was carried on by his brother, Charles B. See, who succeeded Laurance as president.

During the entire period of his employment, there had been no formal or written criticism of Pugh's work.[1] No complaints were ever

---

[1] Huggins testified that in 1953 there was some personality conflict between Pugh and Huggins' assistant, a Mr. Forrest, on account of which Huggins recommended to Laurance See that Pugh be terminated, but See declined. Huggins again recommended Pugh's termination in 1968, under circumstances to be described in this opinion, and again See declined. It does not appear that Huggins' actions in this regard, or the criticism of Pugh which they implied, were made known to Pugh.

raised at the annual meetings which preceded each holiday season, and he was never denied a raise or bonus. He received no notice that there was a problem which needed correction, nor any warning that any disciplinary action was being contemplated.

Pugh's theory as to why he was terminated relates to a contract which See's at that time had with the defendant union.[2] Prior to 1971, the union represented employees of See's as well as employees of certain other candy manufacturers in a multiemployer bargaining unit, and there existed a collective bargaining agreement between the union and an employer association representing those manufacturers. In addition, there existed for many years prior to 1971 a supplemental agreement between the union and See's which contained provisions applicable to See's only.

In 1968 the supplemental agreement contained a new rate classification which permitted See's to pay its seasonal employees at a lower rate. At a company meeting prior to the 1968 negotiations, Pugh had objected to the proposed new seasonal classification on the grounds that it might make it more difficult to recruit seasonal workers, and create unrest among See's regular seasonal workers who had worked previously for other manufacturers at higher rates. Huggins overruled Pugh's objection and (unknown to Pugh) recommended his termination for "lack of cooperation" as to which Pugh's objection formed "part of the reason." His recommendation was not accepted.

The 1968 association and supplemental agreements expired in 1971. Thereafter See's negotiated with the union separately, and not as a part of any employer association.

The 1971 agreement expired in 1973. In April of that year, Huggins asked Pugh to be part of the negotiating team for the new union contract. Pugh responded that he would like to, but he was bothered by the possibility that See's had a "sweetheart contract" with the union. In response, someone banged on the table and said, "'You don't know what the hell you are talking about.'" Pugh said, "Well, I think I know what I am talking about. I don't know whether you have a sweetheart contract, but I am telling you if you do, I don't want to be involved because they are immoral, illegal and not in the best interests of my employees."

---

[2]Respondent Baker's Local No. 125 is the successor to Candy Worker's Local No. 158, also named as a defendant. The term "union" will be used to describe the organization as a continuing entity.

At the trial, Pugh explained that to him a "sweetheart contract" was "a contract whereby one employer would get an unfair competitive advantage over a competitor by getting a lower wage rate, would be one version of it." He also felt, he testified, that "if they in fact had a sweetheart contract that it wouldn't be fair to my female employees to be getting less money than someone would get working in the same industry under the same manager."

The union's alleged participation in Pugh's termination was in the form of a statement attributed to Mr. Button (the individual who succeeded Pugh as production manager) at a negotiating meeting between the company and the union in June 1973. According to one witness, Mr. Button stated at the commencement of the meeting, "Now we've taken care of Mr. Pugh. What are you going to do for us."

DISCUSSION

A. *Historical Background.*

The law of the employment relationship has been, and perhaps still is, in the process of continuing evolution. The old law of master and servant, which held sway through the 18th century and to some extent beyond, viewed the relationship as primarily one of status rather than of contract. While agreement gave rise to the relationship and might establish certain of its terms, it was "custom and public policy, not the will of the parties, [which] defined the implicit framework of mutual rights and obligations." (Selznick, Law, Society and Industrial Justice (1969) p. 123.)

The essence of the relationship as so defined drew its contours from the model of the household—in which, typically, the servant worked, the master had general authority to discipline the servant, and it was the servant's duty to obey. (*Id.*, at pp. 124-125.) At the same time, the master had certain responsibilities for the servant's general welfare. (*Id.*, at p. 128.) The relationship was thus in a sense paternalistic. And it was not terminable at will; rather, there existed a presumption (in the absence of contrary agreement) that employment was for a period of one year. (*Id.*, at p. 125.)

With the industrial revolution in the 19th century the law of master and servant underwent a gradual remodeling, primarily at the hands of

the judiciary. Primary emphasis came to be placed, through contract doctrine, upon the freedom of the parties to define their own relationship. "The emphasis shifted from obligation to freedom of choice." (*Id.*, at p. 131.) The terms of the contract were to be sought in voluntary agreement, express or implied, the employee being presumed to have assented to the rules and working conditions established by the employer. (*Ibid.*)

In light of the generally superior bargaining power of the employer, "the employment contract became [by the end of the nineteenth century] a very special sort of contract—in large part a device for guaranteeing to management unilateral power to make rules and exercise discretion." (*Ibid.*) And management's unilateral power extended, generally, to the term of the relationship as well. The new emphasis brought with it a gradual weakening of the traditional presumption that a general hiring (i.e., one without a specific term) was for a year, and its replacement by the converse presumption that "a general or indefinite hiring is *prima facie* a hiring at will." (Wood, A Treatise on the Law of Master and Servant (1877) § 134, fn. 49.)[3] In California, this presumption is reflected in Labor Code section 2922, which provides: "An employment, having no specified term, may be terminated at the will of either party on notice to the other. Employment for a specified term means an employment for a period greater than one month."

The recognized inequality in bargaining power between employer and individual employee undergirded the rise of the labor unions and the institutionalization of collective bargaining.[4] And through collective bargaining, unions have placed limitations on the employer's unilateral right of termination. Under most union contracts, employees can only be dismissed for "just cause," and disputes over what constitutes cause for dismissal are typically decided by arbitrators chosen by the parties.[5]

---

[3]See Blumrosen, *Workers' Rights Against Employers and Unions: Justice Francis—A Judge For Our Season* (1970) 24 Rutgers L.Rev. 480, 481. It has been observed that what is sometimes called "Wood's rule" finds dubious support in the authorities upon which the treatise relies. (Note, *Implied Contract Rights to Job Security* (1974) 26 Stan.L.Rev. 335, 341.)

[4]Congress, in adopting the National Labor Relations Act in 1935 (ch. 372, § 1, 49 Stat. 449) found "inequality of bargaining power between employees who do not possess full freedom of association or actual liberty of contract, and employers who are organized in the corporate or other forms of ownership association." (29 U.S.C. § 151.)

[5]Approximately 95 percent of collective bargaining agreements contain grievance and arbitration provisions, and approximately 80 percent of the agreements specifically

Collective bargaining agreements, however, cover only a small fraction of the nation's work force,[6] and employees who either do not or (as in the case of managerial employees such as Mr. Pugh) cannot form unions[7] are left without that protection.

■  In recent years, there have been established by statute a variety of limitations upon the employer's power of dismissal. Employers are precluded, for example, from terminating employees for a variety of reasons, including union membership or activities, race, sex, age or political affiliation.[8] Legislatures in this country have so far refrained, however, from adopting statutes, such as those which exist in most other industrialized countries,[9] which would provide more generalized protection to employees against unjust dismissal. And while public employees may enjoy job security through civil service rules[10] and due process,[11] the legal principles which give rise to these protections are not directly applicable to employees in private industry.[12]

Even apart from statute or constitutional protection, however, the employer's right to terminate employees is not absolute. "The mere fact that a contract is terminable at will does not give the employer the absolute right to terminate it in all cases." (*Patterson* v. *Philco Corp.*

require just cause for discharge (see Peck, *Unjust Discharges from Employment: A Necessary Change in the Law* (1979) 40 Ohio St. L.J. 1, 8, and sources there cited).

[6]Somewhat less than 28 percent of the nation's nonagricultural work force are employed under the terms of a union agreement. (U.S. Bureau of Labor Statistics, Directory of National Unions and Employee Associations (1973) at p. 72.)

[7]See, e.g., *NLRB* v. *Yeshiva University* (1980) 444 U.S. 672 [63 L.Ed.2d 115, 100 S.Ct. 856].

[8]See citations contained in *Cleary* v. *American Airlines, Inc.* (1980) 111 Cal.App.3d 443, 450-451 [168 Cal.Rptr. 722].)

[9]"The United States is one of the few industrial countries that does not provide general legal protection against unjust dismissals." (Summers, *Individual Protection Against Unjust Dismissal: Time For A Statute* (1976) 62 Va.L.Rev. 481, 508.) Countries which do provide such protection include France, Germany, Great Britain, and Sweden. (*Id.*, at pp. 508-519.)

[10]Over 90 percent of federal civilian employees enjoy civil service protection against "adverse action" by supervisors, and by a "conservative estimate" more than half of state and local governmental employees are so protected. (Peck, *Unjust Discharges From Employment: A Necessary Change in the Law, supra,* 40 Ohio St. L.J. 1, 8-9.)

[11]Where a public employee's "liberty" or "property" interests are at stake, minimal due process protections of notice and hearing must be afforded. (*Perry* v. *Sindermann* (1972) 408 U.S. 593 [33 L.Ed.2d 570, 92 S.Ct. 2694]; *Skelly* v. *State Personnel Bd.* (1975) 15 Cal.3d 194 [124 Cal.Rptr. 14, 539 P.2d 774].)

[12]For an interesting argument that equal protection or state action principles may require extension of similar protections to employees of "private" employers, see Peck, *Unjust Discharges From Employment: A Necessary Change in the Law, supra,* 40 Ohio St. L.J. 1, 21-22.

(1967) 252 Cal.App.2d 63, 65 [60 Cal.Rptr. 110].) Two relevant limiting principles have developed, one of them based upon public policy and the other upon traditional contract doctrine. The first limitation precludes dismissal "when an employer's discharge of an employee violates fundamental principles of public policy" (*Tameny* v. *Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 170 [164 Cal.Rptr. 839, 610 P.2d 1330]), the second when the discharge is contrary to the terms of the agreement, express or implied. Appellant relies upon both these principles in contesting his termination here.

### B. *Public Policy Limitation.*

Appellant contends that his evidence established a prima facie case of retaliatory termination for reasons which offend public policy in three respects. First, he contends that the evidence tended to show he was terminated because he refused to participate in negotiations for a union contract which would have violated state and federal public policy against restraint of trade; second, that he was terminated because he refused to participate in negotiations for a union contract which violated declared public policy against discrimination based on sex; and third, that he was terminated for reasons which violate the state's policy favoring the exercise of a company director's duty of inquiry.

The first contention finds doctrinal support in the Supreme Court decision in *Tameny* v. *Atlantic Richfield Co., supra.* ■ In *Tameny*, the court held "that an employer's authority over its employee does not include the right to demand that the employee commit a criminal act to further its interests, and an employer may not coerce compliance with such unlawful directions by discharging an employee who refuses to follow such an order." (27 Cal.3d at p. 178.) A pleading which alleged that the plaintiff was terminated because he refused to participate in activity which would have constituted a violation of the antitrust laws was held to state a cause of action.

Appellant's evidence, however, fails to support application of that doctrine. The trial court, in granting the nonsuit, reasoned that there was no evidence that appellant in fact refused or indicated he would refuse to participate in negotiations for a new agreement, or that the terms for which he would be expected to negotiate would pose the same legal problems as those which appellant claimed to inhere in the prior agreement. Assuming, however, that there was sufficient evidence from

which the jury could have filled those evidentiary gaps by inference, there is a more fundamental flaw in appellant's argument. The premise upon which he sought to establish, through expert testimony, that the prior supplemental agreement violated the antitrust laws, was that its existence was kept secret from the other employer members of the multiemployer bargaining unit. Assuming, arguendo, that the premise had legal merit, the factual predicate for that premise is missing. Appellant established only that one employer was unaware of the existence of the supplemental agreement, and that employer was not a member of the multi-employer group. Moreover, by 1973, when appellant was asked to be a member of the negotiating committee, the 1968 agreement had long since expired, and See's was no longer bargaining through the association. Thus, the trial court did not err in granting nonsuit on that theory.

Appellant's second theory is that the supplemental agreement in effect at the time of his termination discriminated against women in violation of the state's Fair Employment Practices Act (now Fair Employment and Housing Act, Gov. Code, § 12900 et seq.), by allowing payment of a lower wage rate to seasonal employees who were, in fact, women. In support of that theory, an attorney with the California Fair Employment Practices Commission testified that on the basis of certain factual assumptions the contract as applied would violate state law.

Assuming, for purposes of analysis, that there was sufficient evidence to establish the prima facie illegality of the supplemental agreement under the Fair Employment Practices Act, appellant's theory again fails for lack of evidentiary support. In addition to the gaps noted in connection with appellant's antitrust theory, there was no evidence that appellant ever communicated to See's his belief or opinion that the existing contract discriminated on the basis of sex.[13]

---

[13]We note that the Fair Employment and Housing Act itself makes it unlawful "For any employer...to discharge...or otherwise discriminate against any person because the person has opposed any practices forbidden under this part...." (Gov. Code, § 12940, subd. (e), added by Stats. 1980, ch. 992, § 4, p. 3148.) That act also establishes a procedure for complaints of violation to be filed with the Fair Employment Practices Commission, for investigation by the commission, for written accusation and hearing, and for relief in the form of an order requiring reinstatement with back pay in the event a violation is determined to exist. (Gov. Code, §§ 12960-12971, added by Stats. 1980, ch. 992, § 4, pp. 3155-3158.) (The relevant provisions of the Fair Employment and Housing Act are substantially equivalent to those formerly found in the Fair

Appellant's third theory is premised on section 309, subdivision (a) of the Corporations Code, which requires of corporate directors that they perform the duties of their office "with such care, *including reasonable inquiry*, as an ordinarily prudent person in a like position would use under similar circumstances." (Italics added.) The evidence does not reasonably support a determination, however, that appellant was engaged as a director in the process of inquiry. (Cf. *Becket* v. *Welton Becket & Associates* (1974) 39 Cal.App.3d 815 [114 Cal.Rptr. 531].)[14]

We conclude that appellant did not establish a prima facie and cognizable case of wrongful termination based upon the public policy theories which he advanced.

### C. *Contract Limitations.*

■ The presumption that an employment contract is intended to be terminable at will is subject, like any presumption, to contrary evidence. This may take the form of an agreement, express or implied, that the relationship will continue for some fixed period of time.[15] Or, and of greater relevance here, it may take the form of an agreement that the employment relationship will continue indefinitely, pending the occur-

---

Employment Practices Act (Lab. Code, §§ 1420, subd. (e) and 1421-1426, repealed by Stats. 1980, ch. 992, § 11, p. 3166).) These procedures were available to appellant, as regards his claim that he was discharged for protesting alleged sex discrimination, and his failure to pursue them arguably constitutes independent grounds for rejecting this aspect of his action against his employer. (*Bennett* v. *Borden, Inc.* (1976) 56 Cal.App.3d 706 [128 Cal.Rptr. 627]; *McCluney* v. *Jos. Schlitz Brewing Co.* (E.D.Wis. 1980) 489 F.Supp. 24; but cf. *Agarwal* v. *Johnson* (1979) 25 Cal.3d 932, 954-955 [160 Cal.Rptr. 141, 603 P.2d 58]; *Monge* v. *Beebe Rubber Company* (1974) 114 N.H. 130 [316 A.2d 549, 62 A.L.R.3d 264].) This issue was not raised by the parties, however, and we do not reach it.

[14]Moreover, it appears from the record that appellant was a director only of the northern California subsidiary, and that the board of directors of See's Candy Shops, Inc. ran the company.

It may be that there is a public policy which favors protection of employees against dismissal for voicing concerns, within an enterprise, concerning the legality or morality of enterprise conduct. (Cf. *Givhan* v. *Western Line Consol. School Dist.* (1979) 439 U.S. 410 [58 L.Ed.2d 619, 99 S.Ct. 693]; *Geary* v. *United States Steel Corporation* (1974) 456 Pa. 171, 185 [319 A.2d 174, 180] (dis. opn.).) Appellant did not invoke such a theory in the trial court, and our disposition of the case on other grounds makes it unnecessary for us to consider the existence of such a limitation or its possible application to appellant's termination.

[15]E.g., *Millsap* v. *National Funding Corp.* (1943) 57 Cal.App.2d 772, 775 [135 P.2d 407] ("reasonable" period of time, determined to be two years).

rence of some event such as the employer's dissatisfaction with the employee's services or the existence of some "cause" for termination.[16] Sometimes this latter type of agreement is characterized as a contract for "permanent" employment,[17] but that characterization may be misleading. In one of the earliest California cases on this subject, the Supreme Court interpreted a contract for permanent employment as meaning "that plaintiffs' employment...was to continue indefinitely, and until one or the other of the parties wish, *for some good reason*, to sever the relation." (*Lord v. Goldberg, supra,* 81 Cal. 596, 601-602, italics added.)

■ A contract which limits the power of the employer with respect to the reasons for termination is no less enforcible because it places no equivalent limits upon the power of the employee to quit his employment. "If the requirement of consideration is met, there is no additional requirement of...equivalence in the values exchanged, or 'mutuality of obligation.'" (Rest.2d Contracts, § 81 (Tent. Draft No. 2, 1965); 1A Corbin on Contracts (1963) § 152, pp. 13-17; see *Chinn v. China Nat. Aviation Corp.* (1955) 138 Cal.App.2d 98 [291 P.2d 91]; *Toussaint v. Blue Cross & Blue Shield of Mich.* (1980) 408 Mich. 579, 600 [292 N.W.2d 880, 885].)

Moreover, while it has sometimes been said that a promise for continued employment subject to limitation upon the employer's power of termination must be supported by some "independent consideration," i.e., consideration other than the services to be rendered,[18] such a rule is contrary to the general contract principle that courts should not inquire into the adequacy of consideration. (See Calamari & Perillo, Contracts (2d ed. 1977) § 4-3, p. 136.) "A single and undivided consideration may be bargained for and given as the agreed equivalent of one promise or of two promises or of many promises." (1 Corbin on Contracts (1963) § 125, pp. 535-536.) Thus there is no analytical reason why an employee's promise to render services, or his actual rendition of services over time, may not support an employer's promise both to pay a particular

[16]E.g., *Lord v. Goldberg* (1889) 81 Cal. 596, 601-602 [22 P. 1126]; *Coats v. General Motors Corp.* (1934) 3 Cal.App.2d 340, 348 [39 P.2d 838]; *Millsap v. National Funding Corp., supra,* 57 Cal.App.2d 772, 776; *Drzewiecki v. H & R Block, Inc.* (1972) 24 Cal.App.3d 695, 704 [101 Cal.Rptr. 169]; *Rabago-Alvarez v. Dart Industries, Inc.* (1976) 55 Cal.App.3d 91, 96 [127 Cal.Rptr. 222]; *Cleary v. American Airlines, Inc., supra,* 111 Cal.App.3d 443, 451-453; *Patterson v. Philco Corp.* (1967) 252 Cal.App.2d 63, 65 [60 Cal.Rptr. 110].)

[17]E.g. *Drzewiecki v. H & R Block, Inc., supra,* 24 Cal.App.3d 695, 704.

[18]E.g., *Speegle v. Board of Fire Underwriters* (1946) 29 Cal.2d 34, 39 [172 P.2d 867]; *Ruinello v. Murray* (1951) 36 Cal.2d 687, 689 [727 P.2d 251]; *Ferreyra v. E. & J. Gallo Winery* (1964) 231 Cal.App.2d 426, 430 [41 Cal.Rptr. 819]; *Levy v. Bellmar Enterprises* (1966) 241 Cal.App.2d 686, 690 [50 Cal.Rptr. 842].

wage (for example) and to refrain from arbitrary dismissal. (See 1 Corbin on Contracts, *op. cit. supra,* § 125, p. 536, fn. 68; 1A Corbin on Contracts, *op. cit. supra,* § 152, pp. 13-17.)

The most likely explanation for the "independent consideration" requirement is that it serves an evidentiary function: it is more probable that the parties intended a continuing relationship, with limitations upon the employer's dismissal authority, when the employee has provided some benefit to the employer, or suffers some detriment, beyond the usual rendition of service. (See *Employment at Will and the Law of Contracts* (1973) 23 Buffalo L.Rev. 211, 221-226.) This functional view of "independent consideration" in the employment context has acquired judicial recognition in other states (see *Littell v. Evening Star Newspaper Co.* (D.C.Cir. 1941) 120 F.2d 36, 37; *Bussard v. College of Saint Thomas, Inc.* (1972) 294 Minn. 215 [200 N.W.2d 155, 161]; *Eilen v. Tappin's, Inc.* (1951) 16 N.J.Super. 53, 56-68 [83 A.2d 817, 818-819]; cf. *Farmer v. Arabian American Oil Co.* (2d Cir. 1960) 277 F.2d 46 (applying New York law); *Stevens v. G. L. Rugo & Sons* (1st Cir. 1953) 209 F.2d 135 (applying Massachusetts law); *Garrett v. American Family Mutual Insurance Co.* (Mo.App. 1974) 520 S.W.2d 102, 110-112), and has been accepted in several recent cases by the California courts. "It is fundamental that when construing contracts involving substantial employment rights, courts should avoid mechanical and arbitrary tests if at all possible; employment contracts, like other agreements, should be construed to give effect to the intention of the parties as demonstrated by the language used, the purpose to be accomplished and the circumstances under which the agreement was made. [Citations.] [¶] *We embrace the prevailing viewpoint that the general rule [requiring independent consideration] is a rule of construction, not of substance, and that a contract for permanent employment, whether or not it is based upon some consideration other than the employee's services, cannot be terminated at the will of the employer if it contains an express or implied condition to the contrary.*" (*Drzewiecki v. H & R Block, Inc., supra,* 24 Cal.App.3d 695, 703-704, italics added.) Accordingly, "[i]t is settled that contracts of employment in California are terminable only for good cause if *either* of two conditions exist: (1) the contract was supported by consideration independent of the services to be performed by the employee for his prospective employer; or (2) the parties agreed, expressly or impliedly, that the employee could be terminated only for good cause." (*Rabago-Alvarez v. Dart Industries, Inc., supra,* 55 Cal.App.3d 91, 96, italics added. Accord, *Cleary v. American Airlines, Inc., supra,* 111 Cal.App.3d 443, 452.)

In determining whether there exists an implied-in-fact promise for some form of continued employment courts have considered a variety of factors in addition to the existence of independent consideration. These have included, for example, the personnel policies or practices of the employer,[19] the employee's longevity of service,[20] actions or communications by the employer reflecting assurances of continued employment,[21] and the practices of the industry in which the employee is engaged.[22]

A related doctrinal development exists in the application to the employment relationship of the "implied-in-law covenant of good faith and fair dealing inherent in every contract." (*Tameny* v. *Atlantic Richfield Co., supra,* 27 Cal.3d 167, 179, fn. 12.) The Supreme Court in *Tameny* took note of authorities in other jurisdictions which have found an employer's discharge of an at-will employee violative of that covenant,[23] but considered it unnecessary to reach that issue in light of its holding that the pleading stated a cause of action on other grounds. (*Ibid.*)

---

[19]E.g., *Cleary* v. *American Airlines, Inc., supra,* 111 Cal.App.3d 443, 455; *Greene* v. *Howard University* (D.C.Cir. 1969) 412 F.2d 1128, 1133. See also *Hepp* v. *Lockheed-California Co.* (1978) 86 Cal.App.3d 714 [150 Cal.Rptr. 408].

[20]*Cleary* v. *American Airlines, Inc., supra,* 111 Cal.App.3d 443, 455; see also *Perry* v. *Sindermann, supra,* 408 U.S. 593, 602 [33 L.Ed.2d 570, 580] ("A teacher like the respondent, who held his position for a number of years, might be able to show from the circumstances of this service—and from other relevant facts—that he has a legitimate claim of entitlement to job tenure"). Indeed, if "independent consideration" were required to support a promise of job security, an employee's lengthy past service would appear to be sufficient. "The employee, in providing long-term employment to a single employer, substantially diminishes his economic mobility." (*Foley* v. *Community Oil Company, Inc.* (D.N.H. 1974) 64 F.R.D. 561, 563; *Maloney* v. *E. I. Du Pont de Nemours & Co.* (D.C.Cir. 1965) 352 F.2d 936, 939 [cert. den. 383 U.S. 948 (16 L.Ed.2d 210, 86 S.Ct. 1211)]; see Blades, *Employment at Will v. Individual Freedom: On Limiting the Abusive Exercise of Employer Power* (1967) 67 Colum.L.Rev. 1404, 1420; Note, *Implied Contract Rights to Job Security, supra* , 26 Stan.L.Rev. 335, 361 et seq.

[21]E.g., *Greene* v. *Howard University, supra,* 412 F.2d 1128 (employee told he is "indispensable"); *Fulton* v. *Tennessee Walking Horse Breeders Ass'n* (1971) 63 Tenn.App. 569 [476 S.W.2d 644] (resolution of congratulations passed at an annual meeting of the directors); *Zimmer* v. *Wells Management Corporation* (S.D.N.Y. 1972) 348 F.Supp. 540 (granting of additional authority, promotion, and permission to participate in special stock transaction).

[22]E.g., *Maloney* v. *E. I. Du Pont de Nemours & Co., supra,* 352 F.2d 936. See Note, *Implied Contract Rights to Job Security, supra,* 26 Stan.L.Rev. 335, 359 et seq.

[23]*Fortune* v. *National Cash Register Co.* (1977) 373 Mass. 96 [364 N.E.2d 1251]; *Monge* v. *Beebe Rubber Co., supra,* 114 N.H 130 [316 A.2d 549]; *Rees* v. *Bank Building and Equipment Corporation* (7th Cir. 1964) 332 F.2d 548 (Missouri law applied). See also *Zimmer* v. *Wells Management Corporation, supra,* 348 F.Supp. 540 (dictum). *Monge* has been followed in *Foley* v. *Community Oil Co., Inc.* (D.N.H. 1974) 64 F.R.D. 561, and *Pstragowski* v. *Metropolitan Life Ins. Co.* (1st Cir. 1977) 553 F.2d 1.

Recently one Court of Appeal has had occasion to confront the applicability of that doctrine more directly. In *Cleary* v. *American Airlines, Inc., supra,* 111 Cal.App.3d 443, an employee who had been dismissed for alleged theft after 18 years of allegedly satisfactory service brought suit claiming, among other things, that his dismissal was in violation of published company policy requiring a "fair, impartial and objective hearing" in such matters, and in breach of the covenant of good faith and fair dealing. Holding that the complaint stated a cause of action on these grounds, the court reasoned: "Two factors are of paramount importance in reaching our result .... One is the longevity of service by plaintiff—18 years of apparently satisfactory performance. Termination of employment without legal cause after such a period of time offends the implied-in-law covenant of good faith and fair dealing contained in all contracts, including employment contracts.... [¶] The second factor of considerable significance is the expressed policy of the employer... set forth in [the] regulation [referred to in the pleadings]. This policy involves the adoption of specific procedures for adjudicating employee disputes such as this one. While the contents of the regulation are not before us, its existence compels the conclusion that this employer had recognized its responsibility to engage in good faith and fair dealing rather than in arbitrary conduct with respect to *all* of its employees. [¶] In the case at bench, we hold that the longevity of the employee's service, together with the expressed policy of the employer, operate as a form of estoppel, precluding any discharge of such an employee by the employer without good cause." (*Id.*, at pp. 455-456.)

If "[t]ermination of employment without legal cause [after 18 years of service] offends the implied-in-law covenant of good faith and fair dealing contained in all contracts, including employment contracts," as the court said in the above-quoted portion of *Cleary*, then a fortiori that covenant would provide protection to Pugh, whose employment is nearly twice that duration. Indeed, it seems difficult to defend termination of such a long-time employee arbitrarily, i.e., without *some* legitimate reason, as compatible with either good faith or fair dealing.[24]

---

[24]For discussion of "good faith and fair dealing" in the employment context, see Madison, *The Employee's Emerging Right to Sue for Arbitrary or Unfair Discharge* (1980) 6 Employee Relations L.J. 422. Generally, see Corbin on Contracts (1980 Supp.) part 1, § 654D; Gellhorn, *Limitations on Contract Termination Rights—Franchise Cancellations* (1967) Duke L.J. 465; MacNeill, *Contracts: Adjustment of Long-Term Economic Relations Under Classical, Neoclassical, and Relational Contract Law* (1978) 72 Nw.U.L.Rev. 854.

We need not go that far, however.[25] In *Cleary* the court did not base its holding upon the covenant of good faith and fair dealing alone. Its decision rested also upon the employer's acceptance of responsibility for refraining from arbitrary conduct, as evidenced by its adoption of specific procedures for adjudicating employee grievances. While the court characterized the employer's conduct as constituting "[recognition of] its responsibility to engage in good faith and fair dealing" (111 Cal. App.3d at p. 455), the result is equally explicable in traditional contract terms: the employer's conduct gave rise to an implied promise that it would not act arbitrarily in dealing with its employees.

■ Here, similarly, there were facts in evidence from which the jury could determine the existence of such an implied promise: the duration of appellant's employment, the commendations and promotions he received, the apparent lack of any direct criticism of his work, the assurances he was given, and the employer's acknowledged policies. While oblique language will not, standing alone, be sufficient to establish agreement (*Drzewiecki* v. *H & R Block, Inc., supra,* 24 Cal.App.3d 695, 703), it is appropriate to consider the totality of the parties' relationship: Agreement may be "'shown by the acts and conduct of the parties, interpreted in the light of the subject matter and of the surrounding circumstances.'" (*Marvin* v. *Marvin* (1976) 18 Cal.3d 660, 678, fn. 16 [134 Cal.Rptr. 815, 557 P.2d 106]; see Note, *Implied Contract Rights to Job Security* (1974) 26 Stan.L.Rev. 335.) We therefore conclude that it was error to grant respondents' motions for nonsuit as to See's.

Since this litigation may proceed toward yet uncharted waters, we consider it appropriate to provide some guidance as to the questions which the trial court may confront on remand. ■ We have held that appellant has demonstrated a prima facie case of wrongful termination in violation of his contract of employment. The burden of coming forward with evidence as to the reason for appellant's termination now shifts to the employer. Appellant may attack the employer's offered explanation, either on the ground that it is pretextual (and that the real reason is one prohibited by contract or public policy (cf. *Bondi* v. *Jewels by Edwar, Ltd.* (1968) 267 Cal.App.2d 672, 676 [73 Cal.Rptr. 494])), or on the ground that it is insufficient to meet the employer's

---

[25]Nor do we consider the implications of the good faith and fair dealing requirement with respect to an employer's obligation, if any, to provide procedural safeguards such as warning of intended discipline or opportunity for response to charges of misconduct.

obligations under contract or applicable legal principles. Appellant bears, however, the ultimate burden of proving that he was terminated wrongfully. (*Cleary* v. *American Airlines, Inc., supra,* 111 Cal.App.3d 443, 456; cf. *McDonnell Douglas Corp.* v. *Green* (1973) 411 U.S. 792, 802-807 [36 L.Ed.2d 668, 677-680, 93 S.Ct. 1817].)

By what standard that burden is to be measured will depend, in part, upon what conclusions the jury draws as to the nature of the contract between the parties. The terms "just cause" and "good cause," "as used in a variety of contexts... have been found to be difficult to define with precision and to be largely relative in their connotation, depending upon the particular circumstances of each case." (*R. J. Cardinal Co.* v. *Ritchie* (1963) 218 Cal.App.2d 124, 144 [32 Cal.Rptr. 545].) Essentially, they connote "a fair and honest cause or reason, regulated by good faith on the part of the party exercising the power." (*Id.,* at p. 145.) Care must be taken, however, not to interfere with the legitimate exercise of managerial discretion.[26] "Good cause" in this context is quite different from the standard applicable in determining the propriety of an employee's termination under a contract for a specified term. (Cf. Lab. Code, § 2924.) And where, as here, the employee occupies a sensitive managerial or confidential position, the employer must of necessity be allowed substantial scope for the exercise of subjective judgment. (See Note, *Protecting At Will Employees Against Wrongful Discharge: The Duty to Terminate Only in Good Faith* (1980) 93 Harv.L.Rev. 1816, 1840.)

### The Case Against the Union.

■ Evidence as to what appellant's successor told union representatives after his termination ("Now we've taken care of Mr. Pugh. What are you going to do for us?"), while hardly in itself weighty, is nevertheless sufficient in context given principles applicable to nonsuits, to justify an inference that appellant was terminated in response to the union's insistence. A union is privileged to induce a breach of contract between employer and employee in the pursuit of a legitimate labor ob-

---

[26]Labor arbitrators have generated a large body of decisions interpreting and applying such terms as "just cause" (see Elkouri & Elkouri, How Arbitration Works (1973) ch. 15), and some of their work may be useful. It must be remembered, however, that arbitrators are selected by the parties and on the basis, partly, of the confidence which the parties have in their knowledge and judgment concerning labor relations matters. (See *Steelworkers* v. *Warrior & Gulf Co.* (1960) 363 U.S. 574 [4 L.Ed.2d 1409, 80 S.Ct. 1347].) For courts to apply the same standards may prove overly intrusive in some cases.

jective (*Imperial Ice Co.* v. *Rossier* (1941) 18 Cal.2d 33, 35 [112 P.2d 631]; *L. A. Pie Bakers Assn.* v. *Bakery Drivers* (1953) 122 Cal.App.2d 237, 243 [264 P.2d 615]; *Lawless* v. *Brotherhood of Painters* (1956) 143 Cal.App.2d 474, 478 [300 P.2d 159]); alternatively, a union's efforts to cause termination of a supervisory employee for reasons bearing upon his relationship to the union may constitute an unfair labor practice subject to the exclusive jurisdiction of the National Labor Relations Board (29 U.S.C. § 158(b)(1)(B)). At this stage, however, the record is inadequate to support definitive application of either privilege or preemption. We therefore conclude that the judgment of nonsuit was erroneously granted with respect to the union as well.

Reversed.

Racanelli, P. J., and Newsom, J., concurred.

On March 27, 1981, the opinion was modified to read as printed above.