[No. B108902. Second Dist., Div. One. Nov. 26, 1997.]

LOS ANGELES COUNTY METROPOLITAN TRANSPORTATION
AUTHORITY, Plaintiff and Respondent, v.
SHEA-KIEWIT-KENNY, Defendant and Appellant.

## COUNSEL

Munger, Tolles & Olson, Brad D. Brian, Bradley S. Phillips, Stephen M. Kristovich, Jonathan E. Altman, McCutchen, Doyle, Brown & Enersen, John C. Morrissey, Monteleone & McCrory and Patrick J. Duffy for Defendant and Appellant.

Jones, Day, Reavis & Pogue, Elwood Lui, Daniel J. McLoon, Daniel D. McMillan, De Witt W. Clinton, County Counsel, David B. Kelsey, Assistant County Counsel, and Charles M. Safer, Deputy County Counsel, for Plaintiff and Respondent.

## OPINION

**VOGEL (Miriam A.), J.**—At the planning stage of a large construction project, the ower and contractor sometimes agree to organize a three-member Disputes Resolution Board (DRB) to offer recommendations for the resolution of the disputes that will inevitably arise during construction. Typically, the owner and contractor each designate one member of the DRB and those two members, in turn, select the third. In the case before us, a DRB was created in this manner and it functioned for about two years—until the owner exercised its contractual right to terminate its appointee for cause. The contractor objected, contending there was no "cause" for the termination, and the owner then filed this action for declaratory relief. The owner prevailed at trial and the contractor now appeals. We affirm, rejecting the contractor's contention that the termination for cause of a DRB member is tantamount to the disqualification for cause of a judge or an arbitrator. As we explain, the DRB is a creature of contract, with limited powers to make *recommendations* for the resolution of disputes, not a constitutional or statutory body vested with the power to making *binding decisions*. "Cause" must therefore be determined as contemplated by the contract.

### FACTS

In 1992, the Los Angeles County Metropolitan Transportation Authority (MTA) awarded to Shea-Kiewit-Kenny (SKK) the "B-251 Contract" for the

construction of a tunnel segment for a city's new subway system. To "provide special expertise to assist in and facilitate the timely and equitable resolution of disputes, claims and controversies" between the MTA and SKK, the B-251 Contract provides for the creation of a DRB to function as set forth in an incorporated "Disputes Review Board Three Party Agreement" (the DRB Agreement). Under the plain language of the B-251 Contract, the MTA and SKK contemplated a three-step dispute resolution process, with the DRB as the second step, preceded by the parties' informal efforts "to amicably and fairly settle their differences" and followed, if necessary, by litigation "in a court of competent jurisdiction."

Membership on the DRB is spelled out in the contract documents: "The [DRB] shall consist of one member selected by the [MTA] and approved by [SKK], one member selected by [SKK] and approved by the [MTA], and a third member selected by the first two members and approved by both the [MTA] and [SKK]. Normally, the third member will act as Chairman for all [DRB] activities." All DRB "members shall be experienced with the type of construction involved in this Project and experienced in the interpretation of contract documents. The goal in selecting the third member is to complement the experience of the first two, thus furnishing technical expertise which will facilitate the [DRB's] operations." DRB members can "be terminated for cause only by their original appointer," so that only the MTA can terminate the MTA-appointed member and only SKK can terminate the SKK-appointed member. But there is no "for cause" limitation for termination of the third member, who can be "terminated if the first two members agree to terminate the third or if the [MTA] and its appointee agree to terminate or [SKK] and its appointee agree to terminate." Replacement members are to be "appointed in the same manner as the original member was appointed. . . ."

The function of the DRB is spelled out in the contract documents—"to fairly and impartially consider the disputes placed before [the DRB] and to provide written *recommendations* to both the [MTA] and [SKK] for resolution of these disputes." (Italics added.) Thus, although the DRB is given the power to "convene . . . hearing[s] to review and consider" disputes, and the MTA and SKK are granted the right "to present . . . evidence at these hearings," the parties "expressly understood that . . . the [DRB's] *recommendations* concerning any such dispute [were] *advisory and not binding*." (Italics added.) Lest there be any doubt about the advisory nature of the DRB's efforts, the contract documents also explain that the DRB's function is "to *recommend settlements* for major disputes between the [MTA] and [SKK] arising from the construction contract" and that, although the parties'

intent was to "place great weight on the [DRB] recommendations, they are *not binding*. If the [DRB's] recommendations do not resolve the dispute, all records and written recommendations . . . will be admissible as evidence in any subsequent litigation proceedings." (Italics added.)

Disputes can be submitted to the DRB by either the MTA or SKK. The DRB hears from both sides, considers the evidence, and reaches a conclusion, at which point its *"recommendations* for resolution of the dispute" are "given in writing" to the MTA and SKK. (Italics added.) Within two weeks thereafter, the MTA and SKK may respond in writing, indicating acceptance or rejection of the Board's recommendations, with a failure to respond constituting an acceptance. If the MTA and SKK resolve their dispute "with the aid of the [DRB's] recommendations," the MTA processes a change order. If either the MTA or SKK reject the DRB's recommendations and the dispute remains unresolved, the MTA or SKK can "appeal the decision back to the [DRB] or a notice of intent to litigate [can] be given within twenty-one days of receiving the [DRB's] decision."

In due course, the members of the DRB were appointed. The MTA appointed Eugene Casey (who was approved by SKK) and SKK appointed Stuart H. Bartholomew (who was approved by the MTA). Casey and Bartholomew, in turn, appointed Peter M. Douglas (who was approved by the MTA and SKK). On October 23, 1993, Casey, Bartholomew and Douglas, along with authorized representatives of the MTA and SKK, signed the DRB Agreement.

In July 1995, following the discovery of a large sinkhole on Hollywood Boulevard, the MTA notified SKK that its performance under the B-251 Contract was terminated. SKK objected and requested an immediate DRB hearing about the propriety of the MTA's purported termination of the B-251 Contract. The MTA responded by letter, stating that its termination of the B-251 Contract had extinguished the DRB's existence and questioning the DRB's jurisdiction. The DRB decided that the contract documents gave it the authority to consider this dispute, and it gave notice to the MTA and SKK of a scheduled hearing. The MTA informed the DRB and SKK that it would not attend, and a hearing was held in its absence, following which the DRB found that the MTA's termination of SKK was a breach of the B-251 Contract. A lawsuit followed, with claims for declaratory relief by the MTA and SKK to determine whether the B-251 Contract had been properly terminated. That lawsuit (which is not before us on this appeal) is still pending.

In August, the MTA notified Casey (the MTA's appointee to the DRB) that his membership on the DRB was terminated for cause. SKK responded

with a letter to the DRB Chairman objecting to the MTA's removal of Casey, contending it was a "legal nullity," and asking the DRB, including Casey, to schedule a hearing on another, then-pending construction dispute. The MTA responded by filing this action for declaratory relief to determine that its removal of Casey was authorized by the DRB Agreement and that, therefore, Casey could no longer act as a member of the DRB. The case was tried to the court, which rendered its decision in favor of the MTA, finding that it had cause to terminate Casey's membership on the DRB. SKK appeals from the judgment thereafter entered.

## DISCUSSION

SKK's appeal is an attack on the evidence, which it says is insufficient as a matter of law to support the trial court's findings that the MTA had cause to terminate Casey's membership on the DRB. Pointing to the public policy favoring out-of-court dispute resolution procedures, SKK's entire argument is premised on the notion that "cause" for the termination of a DRB member is tantamount to "cause" for removal of a judge. As we will explain, there is nothing in the contract documents (or anywhere else) to suggest the parties intended to vest the members of the DRB with life tenure or otherwise to endow the contractually created advisory DRB with the attributes of a constitutional or statutory tribunal. As we will also explain, the record amply supports the trial court's findings of contractual "cause" for Casey's termination.[1]

## I.

SKK contends the "cause" to remove a DRB member must be treated the same as the "cause" to remove a judge. (See *Church of Scientology* v. *Wollersheim* (1996) 42 Cal.App.4th 628, 656 [49 Cal.Rptr.2d 620] [grounds for disqualification of a judge must be asserted at earliest practical opportunity]; *Pacific etc. Conference of United Methodist Church* v. *Superior Court* (1978) 82 Cal.App.3d 72, 84 [147 Cal.Rptr. 44]; *Kreling* v. *Superior Court* (1944) 25 Cal.2d 305, 312 [153 P.2d 734] [a judge's reliance on inadmissible evidence may justify a reversal on appeal but will not support a removal

---

[1]Implicit in SKK's position is the assumption that it has standing to challenge the MTA's termination of its appointee to the DRB. Although the MTA does not contend otherwise, and although we suppose SKK could reach the issue indirectly by claiming the MTA's termination of Casey was a breach of the implied covenant of good faith and fair dealing found in every contract (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, §§ 743-744, pp. 674-676), we do want to make it clear that we are not deciding the standing issue in this case. As do the parties, we simply assume SKK has standing to question the sufficiency of the MTA's decision to terminate Casey for cause.

for cause]; *Shakin* v. *Board of Medical Examiners* (1967) 254 Cal.App.2d 102, 116-117 [62 Cal.Rptr. 274, 23 A.L.R.3d 1398] [a judge's mistake about the law may justify a reversal on appeal but will not support a challenge for cause]; *Liteky* v. *United States* (1994) 510 U.S. 540, 555-556 [114 S.Ct. 1147, 1151-1152, 127 L.Ed.2d 474] [judge's expressions of annoyance or anger do not justify the judge's removal for cause]; *In re Union Leader Corporation* (1st Cir. 1961) 292 F.2d 381, 390 [judicial outrage induced by a litigant does not support a challenge for cause].) We disagree.

The DRB is a creature of contract, not a constitutional or statutory entity, and there is nothing in the contract documents to suggest an intent by the parties to endow the DRB or its members with the attributes of a court of law or even with those of a formal arbitration tribunal. There is nothing in the relationship of the parties (contracting business entities) or the purpose for which they created the DRB (to provide *recommendations* for the resolution of disputes under the contract) or in the extrinsic evidence of industry standards and practices governing DRBs generally to suggest the MTA or SKK intended to treat the DRB as the equivalent of a court.[2] (*Universal Sales Corp.* v. *Cal. etc. Mfg. Co.* (1942) 20 Cal.2d 751, 761 [128 P.2d 665] [the court may look to the object, nature and subject matter of the contract to give effect to the intent of the parties]; *Pacific Gas & E. Co.* v. *G.W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373] [extrinsic evidence is admissible to interpret a contract provision that is reasonably susceptible of the proffered interpretation].)

To the contrary, the contract documents and the extrinsic evidence show nothing more than a carefully crafted contractual arrangement for a three-step dispute resolution process (informal discussions, the DRB and, finally, litigation), pursuant to which the DRB is given the power to hear evidence and make recommendations—but no power to bind the parties to those recommendations. While it is true, as SKK contends, that a DRB recommendation will become final in the absence of objection, the parties' right to object gives the party, not the DRB, the ultimate decision-making authority.

---

[2]Where, as here, extrinsic evidence has been introduced but is not in conflict, we consider the contract de novo. (1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 681, p. 615; *Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865-866 [44 Cal.Rptr. 767, 402 P.2d 839]; *New Haven Unified School Dist.* v. *Taco Bell Corp.* (1994) 24 Cal.App.4th 1473, 1483 [30 Cal.Rptr.2d 469].) The MTA offered the testimony of two expert witnesses, Robert Rubin (a recognized expert on DRBs and related industry standards) and Charles Wolfram (a professor at Cornell Law School and a recognized ethics expert). No expert testimony was offered by SKK.

The DRB members are facilitators or mediators, not adjudicators or arbitrators.[3]

"Cause" for termination must thus be assessed according to the usual rules governing the interpretation of a contractual term that is not defined by the contract. (Civ. Code, §§ 1644, 1647.)[4] Although there is no single or uniform definition of "cause" for all contractual purposes, the courts of this state agree generally that, viewed in light of the circumstances of the case and the nature of the contract, "cause" connotes a fair and honest reason, regulated by good faith on the part of the party exercising the power. (Cf. *Pugh* v. *See's Candies, Inc.* (1981) 116 Cal.App.3d 311, 330 [171 Cal.Rptr. 917]; *R.J. Cardinal Co.* v. *Ritchie* (1963) 218 Cal.App.2d 124, 144-146 [32 Cal.Rptr. 545] ["cause" implies the existence of facts justifying the action taken, "something more than a mere wish" as opposed to an arbitrary act]; *Moore* v. *May Dept. Stores Co.* (1990) 222 Cal.App.3d 836, 839-840 [271 Cal.Rptr. 841] [violation of company policies is "cause" for termination as a matter of law]; Bus. & Prof. Code, § 20999.1 ["cause" for nonrenewal or cancellation of a franchise may be shown by evidence of the dealer's violation of the franchise agreement]; *Encina* v. *Tony Lama Company* (W.D.Tex. 1970) 316 F.Supp. 239, 244 [violation of a term of an employment contract is "cause" for termination].) The circumstances of the case also determine the allowable scope for the exercise of subjective judgment in deciding whether there is "cause." (*Pugh* v. *See's Candies, Inc., supra*, 116 Cal.App.3d at p. 330.)

As the experts explained at trial, DRBs are a form of alternative dispute resolution most commonly used on tunneling and other heavy construction projects. They "are creatures of contract" designed to "provide recommendations as to how a particular dispute should be resolved. . . . Since the recommendations may be rejected by the owner or the contractor, it is essential that both parties have confidence in the DRB as a whole and in each of the individual members. Otherwise, if either party loses confidence in the DRB, [it] cannot be expected to give weight to unfavorable recommendations, such recommendations likely will not be an effective tool to

---

[3]We summarily reject SKK's contention that DRB members must be given the same protections afforded to judges and arbitrators lest all DRBs be crippled by "strategic behavior" aimed at the disruption of all DRB proceedings. Aside from the fact that the approach we adopt does not sanction the kind of conduct SKK purports to be concerned about, the bottom line is that, as with all contracts, the parties are free to agree to whatever standards they choose to impose upon themselves, and nothing in this opinion is intended to preclude the creation of a DRB comprised of members subject to removal according to the rules governing the removal of judges. All we hold is that the parties now before us did not agree to those terms.

[4]Unless otherwise stated, all section references are to the Civil Code.

help resolve disputes, and the [DRB] will unlikely be able to fulfill its purpose."

Of course, the termination of an appointee does not terminate the existence of the DRB. Whatever view the MTA may have about the effect on the DRB of the MTA's purported termination of the B-251 Contract, it is *not* the MTA's position in this case that its termination of Casey affects the continued operation of the DRB. Under the plain language of the contract documents, Casey's termination means only that the MTA will designate a new appointee to the DRB who will then serve in Casey's place. Unless a court ultimately determines that the MTA has effectively terminated the B-251 Contract and, along with it, the DRB, the DRB will continue to function for the term of the contract. Since Casey's termination is not a question of life or death, common sense dictates that the "cause" needed to terminate his membership on the DRB may exist at a level below the cause that might be needed to justify a termination with a more far-reaching effect.

We note also that the third member of the DRB (the one selected by the parties' appointees) may be terminated *without cause,* either by agreement "if the first two members agree to terminate the third or if the [MTA] and its appointee agree to terminate or [SKK] and its appointee agree to terminate." Since the disruption caused by the third member's termination would seem to be essentially the same as that caused by the termination of either party's appointee, the parties' failure to impose a "cause" requirement for the termination of the third member suggests a lower standard of "cause" than that which would govern if cause were required to terminate the third member as well as the others. (§ 1641; *Kerr* v. *Brede* (1960) 180 Cal.App.2d 149, 151 [4 Cal.Rptr. 443] [the whole of a contract is to be taken together with each clause helping to interpret the other].)

Finally, there is the expert testimony about the meaning of "cause" for the termination of an owner's or contractor's appointee to a DRB, and it is this: "[c]onduct which would reasonably cause a person in the position of the particular contracting party . . . to lose confidence" in its appointee. Although it is an objective standard, the question is not what a "reasonable person in the industry would deem to be reasonable or unreasonable conduct" on the part of a DRB member. Rather, the more accurate approach vis-à-vis a DRB is from the "reasonable psyche" of the owner, if it is the owner's appointee, or from the "reasonable psyche" of the contractor, if it is the contractor's appointee, to reflect the differences in their positions and viewpoints. In the context of this case, loss of confidence in Casey, if objectively verifiable by reference to facts material to the MTA, would be sufficient "cause" for his termination.

## II.

The remaining question is whether the evidence shows there was cause for Casey's termination. It does.

### A.

The members of the DRB are bound by contractually imposed duties and responsibilities and by the rules they adopted for their own procedures, including a duty to act impartially and independently in the consideration of facts and circumstances surrounding any dispute; and a duty to "refrain from giving any advice to either party on the conduct of the work or resolution of problems" other than disputes formally referred to the DRB for which written recommendations are issued. In addition, there are express prohibitions against material ex parte communications, and restrictions about communications between DRB members and others during site visits.

### B.

The trial court found that six incidents were proved, each of which independently provided cause for Casey's termination. We agree, but discuss only one since it alone is sufficient to support the judgment in favor of the MTA.

During four days in June and July 1994, the DRB held hearings regarding the MTA's removal of SKK's General Superintendent (Norm Hutchins) following a series of safety problems involving Hutchins. SKK objected to Hutchins's removal and submitted the matter to the DRB. During a break on the second day of a four-day hearing, Casey took Joel Sandberg, the MTA's Deputy Executive Officer for Engineering and Construction, aside and told him that the MTA should settle the Hutchins dispute because the MTA was going to "lose" and "would certainly not like the . . . recommendations of the DRB." Sandberg was shocked that these comments were made at all, and particularly because they were made before the MTA had completed the presentation of its case, "so early that it defeated [the MTA's] opportunity to fully complete its case." The trial court found Casey had violated the prohibition against ex parte communications, and that this incident showed that Casey had improperly prejudged the issues before the hearing was completed.

The evidence supports the trial court's factual findings and its legal conclusion about the effect of Casey's ex parte communication. Casey violated the express prohibitions against ex parte communications and

against the expression of "any opinion concerning the merit or lack of merit of any facet of the case . . . during hearings." As Casey conceded, this rule was to be followed at all times, with "no exceptions." In addition, Casey's comments showed that he had improperly prejudged the matter before him. No more is necessary, and the fact that SKK presented evidence suggesting a different slant to Casey's commentary is irrelevant. The trial court made specific findings on the issue of credibility, and concluded that Casey's self-serving testimony was "evasive and deceptive" as well as "willfully false" insofar as he denied the actions attributed to him by the MTA. (*Pacific etc. Conference of United Methodist Church* v. *Superior Court, supra*, 82 Cal.App.3d at pp. 85-86 [comments meant to encourage a party to settle, if made when no comments at all should have been made, are improper]; *Rosenfield* v. *Vosper* (1941) 45 Cal.App.2d 365, 371 [114 P.2d 29].) The trial court's credibility findings (which are fully supported by the record) are binding on this appeal. (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925-926 [101 Cal.Rptr. 568, 496 P.2d 480].)

This incident was sufficient to constitute cause for Casey's termination. It is a violation of an express obligation assumed by Casey when he signed the DRB Agreement and became a member of the DRB. As the uncontroverted evidence shows, the entire DRB process presumes the objectivity and trustworthiness of the DRB members, and this voluntary dispute resolution process cannot exist when either of the contracting parties is unable to trust its own appointee to the DRB. Indeed, all three members of the DRB must be neutral, and their execution of the DRB Agreement expressly obligates them "to serve both parties equally and fairly."[5] Proof of the facts showing Casey's violation of the rules establishes that the MTA's cause was

---

[5]According to the Construction Dispute Review Board Manual (McGraw Hill 1995), pages 29-30, 40, the members of the DRB must "strive for a recommendation consistent with the contract language which forms the basis of the parties' agreement. Indeed, the standard three-party agreement requires a DRB to comply with applicable laws and contract provisions. . . . [¶] Without question, in addition to technical competence, each [DRB] member must have a neutrality or objectivity that is above reproach. This neutrality is a key to the success of DRBs. . . . [¶] . . . All [DRB] members as well as all owner and contractor personnel need to understand that individual DRB members are not the 'representative' or 'advocate' of the party which selected them. The entire [DRB] must function and always appear as an objective, impartial, and independent body. . . . [¶] The [DRB] and its members are specifically forbidden to give consulting advice to either party. The reason is obvious. The DRB's position would be compromised if such advice should later be drawn into a contract dispute."

objectively verifiable and also establishes that the MTA was acting in good faith. If the contractual provision for termination of DRB members is to have any meaning at all, no more can be required.[6]

In sum, we find substantial evidence to support the trial court's findings that the MTA acted reasonably and in good faith, and that it terminated Casey based upon objectively verifiable "cause."

## DISPOSITION

The judgment is affirmed. The MTA is awarded its costs of appeal.

Spencer, P. J., and Masterson, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 18, 1998.

---

[6]We reject SKK's contention that this incident should be ignored because Casey was not challenged at an earlier time. There were at least five other subsequent incidents which the trial court found sufficient to constitute cause for Casey's removal, and there is nothing in the contract to prevent the owner or the contractor from raising old as well as new incidents when it must defend its decision ultimately to terminate its appointee. We selected this incident because it lends itself to the most efficient discussion, not because the other incidents are less persuasive. They are not. We emphasize also that whatever relevance this issue of delay might have to the disqualification for cause of a judge or arbitrator, it is insufficient by itself to defeat an otherwise sufficient showing of cause for removal under the terms of the contract made by these parties. We also note that the trial court expressly rejected SKK's claim of prejudice from any purported delay.