[No. D036734. Fourth Dist., Div. One. Sept. 12, 2003.]

SEHULSTER TUNNELS/PRE-CON, Plaintiff, Cross-defendant and Respondent, v.
TRAYLOR BROTHERS, INC./OBAYASHI CORPORATION, Defendant, Cross-complainant and Appellant;

TRAYLOR BROTHERS, INC., et al., Defendants and Appellants;
CITY OF SAN DIEGO, Defendant, Cross-defendant and Appellant;
SEHULSTER TUNNELS, INC., et al., Cross-defendants and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

* Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part I.B.

1330

COUNSEL

Hillyer & Irwin, Robert L. Zajac, Robert P. Allenby; McKenna, Long & Aldridge, Mark G. Budwig and Michael H. Fish for Defendant, Cross-complainant and Appellant and for Defendants and Appellants.

McAtee & Harmeyer, Greg A. McAtee; Casey Gwinn, City Attorney, Anita Noone, Assistant City Attorney, and Michael R. McGuinness, Deputy City Attorney, for Defendant, Cross-defendant and Appellant.

Paul, Hastings, Janofsky & Walker, Glenn Douglas Dassoff and Lisa M. La Fourcade for Plaintiff, Cross-defendant and Respondent and for Cross-defendants and Respondents.

OPINION

**BENKE, Acting P. J.**—These appeals involve a $90 million contract (the Prime Contract) to build the South Bay Ocean Outfall Project (the Project), a 3.5-mile tunnel under the Pacific Ocean to discharge treated sewage at sea. The City of San Diego (City) was the Project owner, Traylor Brothers, Inc./Obayashi Corporation, a joint venture (TBO), was the general contractor and Sehulster Tunnels/Pre-Con, a joint venture (Sehulster), was the subcontractor that supplied to TBO the precast concrete ring segments lining the tunnel. The tunnel was built and apparently works flawlessly. However, disputes arose between City, TBO and Sehulster for cost overruns incurred by Sehulster in manufacturing the tunnel ring segments as a result of certain design changes in the Project. Following a jury trial on Sehulster's complaint for breach of contract and related causes of action against TBO and TBO's cross-complaint against City for indemnity, the jury awarded Sehulster $2.8 million in damages against TBO and determined that TBO was entitled to 30

percent indemnity from City. The trial court awarded Sehulster $1.6 million in attorney fees against TBO but no attorney fees to TBO against City.

TBO and City separately appeal the judgment. TBO contends the trial court erred by ruling that Sehulster's claims were not barred as a matter of law because Sehulster did not comply with the Dispute Review Board (DRB) process contained in the Prime Contract between City and TBO before pursuing litigation. TBO further contends the trial court erroneously decided the parties' postjudgment motions pertaining to the scope of the release in the parties' May 1997 settlement agreement. TBO also contends it cannot be liable under an abandonment theory, reasoning that if City cannot be held liable under an abandonment theory on a public works contract then it cannot be held liable for abandonment under circumstances in which City is required to indemnify it. TBO's remaining contentions assert the trial court erred by denying its motion for judgment notwithstanding the verdict (JNOV) on its indemnity claims against City, its motion for attorney fees against City and its motion to require City to indemnify it for a portion of Sehulster's attorney fees awarded against TBO. City's appeal presents a multifaceted attack on the portion of the judgment awarding indemnity to TBO. City contends that as a matter of law TBO has no cause of action for equitable or implied contractual indemnity against it; the trial court prejudicially erred in instructing the jury regarding indemnity; the trial court prejudicially misinterpreted the special verdict form; the judgment entered is inconsistent with the verdict; and in any event the judgment against City must be reversed because it cannot be held liable for cost overruns on a public works project under an abandonment, quantum meruit or other equitable theory, including implied contractual indemnity.[1]

We conclude that if the interests of the general contractor and the owner are adverse to those of the subcontractor, the contractually mandated DRB process contained in the Prime Contract between City and TBO is presumptively biased and unenforceable as a condition precedent to the subcontractor pursuing litigation. We further hold the trial court correctly interpreted the scope of the release in the parties' May 1997 settlement agreement and TBO can be liable to Sehulster under an abandonment theory. We also conclude that because City did not breach its contract with TBO, as a matter of law City cannot be held liable to TBO under the equitable theory of implied contractual indemnity on a public works contract for cost overruns incurred

[1] Following oral argument and at our request, TBO and City filed supplemental briefs regarding the DRB process, whether the equitable theory of implied contractual indemnity implicates the public policy considerations recognized in *Amelco Electric v. City of Thousand Oaks* (2002) 27 Cal.4th 228 [115 Cal.Rptr.2d 900, 38 P.3d 1120], the existence of any authority addressing whether a public entity can be held liable to a general contractor under an implied contractual indemnity claim in a public works contract, and the nature of the parties' contractual relationships in the context of TBO's cause of action for implied contractual indemnity.

by a subcontractor under a purchase order agreement with the general contractor. To permit TBO to recover under the equitable theory of implied contractual indemnity would ignore the provisions of the Prime Contract that govern modification of the originally negotiated contract price and the parties' mutual understanding the tunnel ring segment design changes would have no cost impact on the Prime Contract. Accordingly, we reverse the indemnity portion of the judgment in favor of TBO against City. In all other respects, we affirm the judgment.[2]

## FACTUAL AND PROCEDURAL BACKGROUND

The Project is located north of the Mexican border in Southern San Diego County, and was designed for City by Parsons Engineering (Parsons). On completion of the plans, City solicited bids for construction of the Project. TBO was the lowest bidder at approximately $90 million. The Project was intended to facilitate cleanup of the beaches polluted from raw sewage entering into the Tijuana River Valley. It connects the South Bay International Water Treatment Plant with an ocean outfall through a 200-foot drop shaft to a three and one-half mile long, 11-foot diameter tunnel approximately 100 feet under the ocean floor. The tunnel was designed to be drilled by a tunnel-boring machine and lined with precast concrete rings, originally designed to be four feet wide, consisting of five segments of equal size transported in pieces to form a ring behind the boring machine. The ring segments were to be bolted to each other and to the preceding ring as the tunnel-boring machine progressed through the ground. In August 1995 TBO and City entered into the Prime Contract. On October 9 TBO entered into a written purchase order with Sehulster to manufacture the tunnel rings specified in the Prime Contract for $16,604,000.

During negotiations for the purchase order with Sehulster, TBO discovered that the tunnel-boring machine it ordered was not compatible with the bid design of the tunnel ring segments. After bidding, TBO advised City that it believed the tunnel-boring machine was not compatible with the original ring design and the machine would have to be made longer, increasing the risk that it would lodge in the tunnel, jeopardizing the entire project. Although City's engineers did not concur with TBO's assessments, they agreed that the longer boring machine shield would increase skin friction and might inhibit advancement of the shield. TBO then requested City to redesign the tunnel ring segments to be compatible with the unmodified tunnel boring machine, prompting the parties to meet and confer. TBO advised City that if it did not redesign the tunnel ring segments, TBO would immediately start to build an extended version of the tunnel-boring machine at a cost of between $300,000

---

[2] Our resolution of the cited issues makes it unnecessary for us to address the remaining contentions of TBO and City.

and $1 million. It cautioned City that proceeding in that manner would be "technically imprudent." Apparently deciding to work with TBO, which was responsible for providing the boring machine, and to not risk the machine becoming lodged in the tunnel, City elected to redesign the tunnel ring segments and directed Parsons to do so. As a result, the tunnel ring design changed from five equal segments measuring 72 degrees each, to two 82 1/2 degree segments, two 80 degree segments and one 35 degree "key" segment. City issued the new design drawings as a change order on December 15, 1995, and directed TBO to build them. TBO advised City there might be additional costs caused by the new design.

TBO entered into the purchase order with Sehulster before City had completed its revised ring design. On TBO's instruction to Sehulster to manufacture the redesigned rings, Sehulster advised TBO that it would incur additional costs. In fact, fewer than three months later, Sehulster submitted a $103,583 itemized claim to TBO for additional costs incurred by it to make the ring segment design changes and to manufacture the new ring segment molds. The parties ultimately settled this claim in May 1997 for approximately $14,000. Because Sehulster had cash flow problems, it agreed to discount its claim in exchange for receiving from TBO under its purchase order a cash infusion of approximately $1.26 million in early payments, which City agreed to prematurely release to TBO. Sehulster further agreed that "[a]ny and all claims for extras made by [it], prior to May 1, 1997, are dropped."

Several months later, Sehulster notified TBO that it was experiencing an unusual amount of damage to its molds, and that it was going to make a claim against City for those costs. In January 1998 Sehulster submitted to TBO a $2,545,000 written claim for additional work resulting from the tunnel ring segment design changes. Pursuant to the contractual pass-through provisions in its purchase order with TBO, Sehulster requested TBO to submit the claim to City, explaining that it was forced under protest[3] to provide bolt pockets that were not within the norm and to locate the lifting point off center, causing damage to the molds. TBO submitted the claim to City as a "Request for Change," but City's construction manager rejected it. Following Sehulster's and TBO's certifications of the claim against City, Sehulster asked TBO to pursue it under contractual dispute resolution requirements contained in the Prime Contract. TBO complied, forwarding the claim to City, which again rejected it. Although Sehulster was initially prepared to submit the claim to the DRB for the Project, it refused to do so after City and TBO

---

[3] On March 11, 1996, Sehulster complained at an all-hands meeting regarding the bolt pocket and off-center lifting point. It requested City to make design changes that would permit it to modify the bolt pocket, but City refused. Sehulster then proceeded with making the redesigned ring segments under protest.

refused to permit Sehulster to appoint a panel member to join the panel members appointed by City and TBO. Under the Prime Contract, City and TBO each appointed a DRB panel member, subject to approval by the other party, with the third member selected by the first two appointees, again subject to approval by the parties. Sehulster's alternative proposal of the having the matter mediated before "a truly unbiased third party" was rejected.

On July 20, 1998, Sehulster filed its original complaint against TBO, TBO's payment bond sureties Aetna Casualty and Surety Company (Aetna)[4] and Fireman's Insurance Company of Newark, New Jersey (Fireman's), and City, alleging breach of contract, abandonment of contract and related causes of action, and seeking to recover damages for its cost overruns relating to manufacturing the tunnel ring segments. TBO demurred, contending that Sehulster had not complied with the contractually mandated dispute resolution procedure, which was a condition precedent to filing a lawsuit. City moved, with TBO joining, to compel Sehulster to "arbitrate" before the DRB. The court denied the motion, but sustained TBO's demurrer with leave to amend. Sehulster asserted only a stop notice action against City, requesting it to withhold $5,439,042.54 plus costs from TBO and to earmark that amount for Sehulster until resolution of the dispute. After TBO filed a stop notice release bond, Sehulster filed a first amended complaint adding a cause of action on the stop notice release bond against the sureties, Fireman's, Aetna and Travelers Casualty and Surety Company of America (Travelers) and dismissed City from the lawsuit. Sehulster also alleged in the first amended complaint that it was not bound by the dispute resolution requirements because that process was biased, futile and waived. TBO unsuccessfully demurred again on the ground Sehulster had not complied with the dispute resolution procedure. TBO then answered the first amended complaint and later cross-complained against City for equitable indemnity and implied contractual indemnity. City answered and later unsuccessfully moved for summary judgment on the cross-complaint.

In late February 2000 the jury trial began. At the conclusion of the evidence, City unsuccessfully moved for a directed verdict on TBO's cross-complaint against it on the grounds that it did not owe a duty to Sehulster to prevent cost overruns, the plans and specifications did not misrepresent or conceal a material fact, City did not breach the Prime Contract, and the express indemnity provision of the Prime Contract barred TBO's equitable indemnity claims. After almost 10 days of deliberation, the jury returned verdicts for Sehulster against TBO in excess of $2.2 million for breach of

---

[4] During the pendency of the superior court proceedings, Aetna Casualty and Surety Company changed its name to Travelers Casualty and Surety Company. For clarity, we refer to this defendant as "Aetna."

contract and $2.8 million under a contract abandonment theory.[5] By special verdict, the jury found: pursuant to the May 1997 settlement Sehulster had released its right to pursue claims arising out of the design of the bolt pockets and off-center lifting point on the key segments; TBO was entitled to indemnity against City; TBO did not breach the implied warranty that the plans and specifications for the tunnel ring segments were workable, correct or sufficient; and City was obligated to indemnify TBO for 30 percent (abandonment theory) or 40 percent (breach of contract theory) of Sehulster's net actual damages.

Following entry of judgment, TBO unsuccessfully filed four motions for JNOV, two motions to vacate the judgment and a motion for new trial or, alternatively, for a modification of the damage award. City unsuccessfully moved for JNOV, for new trial and to tax costs. The resulting judgment held Fireman's and Travelers jointly liable with TBO to Sehulster for a total monetary award of $3,031,171.02, including prejudgment interest, and held City liable to TBO for indemnity in the amount of $909,351.30. Sehulster was later awarded, as the prevailing party, attorney fees in excess of $1.6 million, and TBO's motions for indemnification against City for Sehulster's attorney fees and for attorney fees in the implied indemnity actions against City were denied. TBO and City timely appealed.

I

TBO'S APPEAL

A. *Denial of TBO's Motion for JNOV Regarding the DRB*

Pursuant to section 16.4.2.1 of the Prime Contract between City and TBO, the parties agreed the contractor shall submit any claim or dispute to the DRB should it disagree with City's Construction Manager's "Final Determination." The purchase order executed by Sehulster and TBO incorporated by reference the general conditions of the Prime Contract. (See *Slaught v. Bencomo Roofing Co.* (1994) 25 Cal.App.4th 744, 748–751 [30 Cal.Rptr.2d 618]; Acret, Construction Arbitration Handbook (2003 supp.) Subcontractor, § 3.60, pp. 284–288, and cases there cited.) Under section 16.4.2.1, after City rejected TBO's "Request for Change" based on Sehulster's pass-through claim, Sehulster was required to submit the claim through TBO to the DRB if it disagreed before pursuing litigation. Consequently, TBO asserts that under the governing contracts a subcontractor intending to file a lawsuit must first, as a condition precedent, submit the dispute to the

---

[5] The parties stipulated and the court approved that Sehulster's damages would be the greater of the two damage awards.

DRB, a three-member panel of construction professionals, which issues a nonbinding opinion. Although TBO and City demanded that Sehulster submit this dispute to the DRB, Sehulster refused and filed this lawsuit. After the trial court denied TBO's series of motions regarding this issue and essentially granted a directed verdict for Sehulster on the issue, TBO unsuccessfully "moved for a JNOV."[6] TBO contends the record is devoid of evidence supporting the trial court's relevant findings as well as Sehulster's claims that the record shows the DRB process was presumptively biased and thus unenforceable, the DRB was actually biased, and TBO had waived the DRB provisions. We conclude the trial court correctly ruled in that the DRB process, within the context presented here of a subcontractor whose interests are antithetical to those of the general contractor and the owner, was presumptively biased and thus unenforceable as a condition precedent to pursuing litigation.

Under the Prime Contract, City and TBO agreed to establish the DRB to assist in resolving disputes, claims and other controversies arising out of the

---

[6] The procedural background for this issue is unusual. TBO demurred to Sehulster's complaint asserting that it had not complied with the contractually mandated DRB process—an allegedly necessary condition precedent to filing a lawsuit. Additionally, City moved, with TBO joining, to compel Sehulster to "arbitrate" before the DRB. The court denied the motion, but sustained TBO's demurrer with leave to amend. Sehulster then amended its complaint to allege that TBO had waived the DRB provisions and that in any event the provisions were unenforceable because the DRB was biased and violated Sehulster's due process rights. At the end of Sehulster's case-in-chief, TBO moved for nonsuit on the grounds that Sehulster had not introduced evidence creating a triable issue of waiver, bias or futility of the DRB process. The court denied the motion. After all the parties had rested, TBO renewed its arguments in the form of a motion for a directed verdict. In denying the motion, the court essentially granted Sehulster a directed verdict on the issue, ruling as a matter of law that TBO had waived the DRB provisions because it had not pursued a writ or a motion for reconsideration after its second demurrer was overruled. Alternatively, the trial court ruled that ordering the parties to participate in the DRB process would be a useless judicial act at that point in time because the panel had been disbanded. Consequently, the trial court instructed the jury that the issue regarding the requirement to proceed first with the DRB had been removed by it from their consideration. After the jury returned its verdict, TBO "moved for a JNOV" based on Sehulster's noncompliance with the DRB requirements. Because there was no verdict on this issue, the motion was mislabeled and perhaps could have been considered as a motion to vacate under Code of Civil Procedure section 663 or for new trial. In any event, the trial court essentially reversed its prior ruling that TBO had waived its rights under the DRB by not filing a writ petition after its second demurrer was overruled. However, the court nevertheless denied the motion, finding: TBO's conduct was inconsistent with the desire to conduct DRB proceedings; such proceedings would have revealed the details of Sehulster's discovery and position to its prejudice; the DRB had been disbanded six months before trial; and the DRB process did not provide Sehulster the opportunity to present its case because its case had to be presented by TBO as the general contractor. We note that an order denying a motion to vacate under Code of Civil Procedure section 663 is appealable even though the grounds for the motion can be urged on appeal from the judgment, but an order denying a motion for a new trial is not. (*Socol v. King* (1949) 34 Cal.2d 292, 296–297 [209 P.2d 577]; *Gallup v. Board of Trustees* (1996) 41 Cal.App.4th 1571, 1573, fn. 1 [49 Cal.Rptr.2d 289], and cases there cited.)

construction of the Project. The DRB process sought to facilitate timely and equitable resolution of disputes between the parties to avoid construction delay and litigation. The Prime Contract provided that either City or TBO *could* refer a dispute to the DRB, which was charged with impartially and promptly considering referenced disputes and providing written nonbinding recommendations to assist their resolution. However, should TBO disagree with City's Construction Manager's Final Determination, the contract required TBO to submit the matter to the DRB. The Prime Contract provided the DRB consist of one member selected by City and approved by TBO, one member selected by TBO and approved by City, and a third member, who would serve as chairperson, selected by the first two members and approved by both City and TBO. The Prime Contract further required the DRB members to be neutral, impartial and without any conflict of interest. It strictly prohibited DRB members from having any interest in, or relationship with, the parties to the dispute and required them to disclose any past, present or future planned direct or indirect relationships with them. Although the DRB's recommendations are not binding, the Prime Contract provided for their admissibility into evidence in any later dispute resolution or legal proceeding. Additionally, the contract provided that the fees and expenses of all three DRB members would be shared equally by City and TBO.

The DRB process constitutes a form of alternative dispute resolution (ADR) most commonly employed in tunneling and other large, complex, heavy construction projects. First utilized in the mid-1970's, it has proven particularly advantageous in contracts performance of which will take a long period of time, and in which disputes are inevitable and multiple installment payments are contractually required on completion of performance milestones or components of the work. Generally, the DRB serves as a safety net to resolve problems or matters about which reasonable people could differ before they harm the business relationship between the parties and result in acrimonious litigation. It is composed of three experts, selected by the parties at the beginning of the project, who become familiar with it, monitor its progress and are available to provide advisory decisions on short notice concerning disputes the parties are unable to resolve themselves. The availability of the DRB and its familiarity with the project enable prompt resolution of disputes, which furthers the goal of preserving cooperative relationships between the contracting parties. The DRB process resembles the arbitration process with several significant differences. First, the DRB is a standing tribunal contractually required to be formed and in place within a few months after the owner gives the contractor notice to proceed. Second, the process envisions an introductory/orientation meeting for the DRB members to become acquainted with the owner, the contractor, and their key personnel; a brief history of the project, including significant potential technical, environmental, political or social issues that might arise from it;

and the scope and anticipated schedule of construction. Third, the DRB meets regularly throughout construction of the project. The frequency of meetings is dictated by the project's size, complexity, schedule and number of claims or problems. Fourth, unlike standing arbitrators who make immediately binding decisions, the DRB issues advisory opinions or nonbinding recommendations. (Knight et al., Cal. Practice Guide: Alternative Dispute Resolution (The Rutter Group 2001) ¶¶ 3:720–3:723, pp. 3-92 to 3-92.1; Henn, *Dispute Review Boards: An ADR Form for the Construction Industry* (1999) 28 Colo. Law. 51–52; Groton, *Alternative Dispute Resolution in the Construction Industry* (1997) 52 Disp.Resol. J. 48, 53–54; Rubin & Carbajal-Quintas, *Alternative Dispute Resolution*, Drafting Construction Contracts and Handling Construction Litigation 1993: Preparing for the "New" Public and Private Works, 391 PLI Real Estate Law and Practice Course Handbook Series 439, 444–448; Groton, Alternative Dispute Resolution in the Construction Industry (1992 supp.) §§ 25.3–25.5, pp. 35–40; see also Mix, *ADR in the Construction Industry: Continuing the Development of a More Efficient Dispute Resolution Mechanism* (1997) 12 Ohio St. J. Disp. Resol. 463, 475–476.)

As exemplified here, the DRB is a creature of contract designed to provide recommendations to resolve particular disputes. Because the DRB's recommendations are nonbinding and may be rejected by either the owner or the contractor, it is important for the credibility of the DRB that the parties perceive its members as generally qualified and neutral. The DRB process is designed to promote the parties' confidence in it by providing their equal involvement in the selection of the individual DRB members who have experience in that type of construction, contract interpretation and dispute resolution. (Knight et al., Cal. Practice Guide: Alternative Dispute Resolution, *supra,* ¶ 3:722, pp. 3-92 to 3-92.1; *Los Angeles County Metropolitan Transportation Authority v. Shea-Kiewit-Kenny* (1997) 59 Cal.App.4th 676, 682–684 [69 Cal.Rptr.2d 431]; see Rubin & Carbajal-Quintas, *Alternative Dispute Resolution*, Drafting Construction Contracts and Handling Construction Litigation 1993: Preparing for the "New" Public and Private Works, 391 PLI Real Estate Law and Practice Course Handbook Series 439, *supra,* at p. 445.)

Sehulster contends its compliance with the DRB process was excused because the provisions of the Prime Contract governing the DRB rendered it presumptively biased against Sehulster as a subcontractor.[7] ■ Sehulster is not required to comply with the DRB process if it can show that the terms

---

[7] TBO urges us to examine and analyze the ruling within the context of the trial court's statement of reasons underlying it. However, we review the correctness of the challenged ruling on appeal and are not limited by the trial court's reasons supporting it. The reason the trial court's rationale is generally not reviewable is because the appellant is prejudiced by the judgment or order, not the reasons for it. Consequently, if correct on any theory of applicable law, the challenged ruling must be affirmed. (*D'Amico v. Board of Medical Examiners* (1974)

of the process are *unconscionable*. (*Brutoco Engineering & Construction, Inc. v. Superior Court* (2003) 107 Cal.App.4th 1326, 1331 [132 Cal.Rptr.2d 866]; see *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 113–114 [99 Cal.Rptr.2d 745, 6 P.3d 669].) The first element of unconscionability is adhesion. (*Graham v. Scissor-Tail, Inc.* (1981) 28 Cal.3d 807, 817–819 [171 Cal.Rptr. 604, 623 P.2d 165].) The second element is that the party seeking to avoid the contractual provisions must establish that a given term is so harsh and one-sided that it " 'shock[s] the conscience.' " (*Brutoco Engineering & Construction, Inc. v. Superior Court, supra,* 107 Cal.App.4th at p. 1331; *Pardee Construction Co. v. Superior Court* (2002) 100 Cal.App.4th 1081, 1090 [123 Cal.Rptr.2d 288].)

 An agreement to submit a dispute to ADR for a binding decision will not be enforced if the designated decisional body is so associated with a party that it is presumptively biased in favor of that party. (*Graham v. Scissor-Tail, Inc, supra,* 28 Cal.3d at pp. 821, 825–827; see *Richards v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1976) 64 Cal.App.3d 899, 906 [135 Cal.Rptr. 26].) Similarly, a contractual condition precedent to litigation of submitting a claim to the DRB process for a nonbinding recommendation will not be enforced if the decisional body is so associated with the adverse parties that it is presumptively biased in their favor. In *Graham,* our Supreme Court refused to enforce an arbitration provision designating one party's union as arbitrator of disputes under the contract. The court found as a matter of law that the arbitrator, by reason of its status and identity, was presumptively biased in favor of one party. (*Graham v. Scissor-Tail, supra,* at p. 821.) Concluding the governing contract to be one of adhesion, the court declared: "[W]hen as here the contract designating such an arbitrator is the product of circumstances suggestive of adhesion, the possibility of overreaching by the dominant party looms large; contracts concluded in such circumstances, then, must be scrutinized with particular care to insure that the party of lesser bargaining power, in agreeing thereto, is not left in a position depriving him of any realistic and fair opportunity to prevail in a dispute under its terms." (*Id.* at pp. 824–825.) Emphasizing that contractual ADR must operate within minimum levels of integrity to pass judicial muster, the court held that the minimum levels of integrity had not been achieved and the agreement to arbitrate was unenforceable on grounds of unconscionability. (*Id.* at pp. 825, 827.) The court reasoned: "[A] contract [that] purports to designate one of the parties as the arbitrator of all disputes arising thereunder is to this extent illusory—the reason being that the party so designated will have an interest in the outcome [that], in the view of the law, will render fair and reasoned decision, based on the evidence presented, a virtual impossibility. Because, as

11 Cal.3d 1, 18–19 [112 Cal.Rptr. 786, 520 P.2d 10]; *People v. Zapien* (1993) 4 Cal.4th 929, 976 [17 Cal.Rptr.2d 122, 846 P.2d 704]; *California Service Station etc. Assn. v. American Home Assurance Co.* (1998) 62 Cal.App.4th 1166, 1171 [73 Cal.Rptr.2d 182].)

we have explained, arbitration (as a contractually structured substitute for formal judicial proceedings) contemplates just such a decision, a contractual party may not act in the capacity of arbitrator—and a contractual provision [that] designates him to serve in that capacity is to be denied enforcement on grounds of unconscionability. We have also indicated that the same result would follow, and for the same reasons, when the designated arbitrator is not the party himself but one whose interests are so allied with those of the party that, for all practical purposes, he is subject to the same disabilities [that] prevent the party himself from serving. Again, a contractual provision designating such an entity as arbitrator must be denied enforcement on the ground that it would be unconscionable to permit that entity to so serve." (*Id.* at p. 827.)

■ A single arbitrator unilaterally selected by a contracting party adverse to the other party is presumed to be biased. (*American Home Assurance Co. v. Benowitz* (1991) 234 Cal.App.3d 192, 203–204 [285 Cal.Rptr. 626].) Consequently, the most commonly used method of appointing DRB members is for each party to appoint one member and obtain the other party's approval of that appointment, and then the two approved DRB members select the third member and obtain the parties' approval of that selection. By using this formula, each party to the contract has a voice in the selection of the third *neutral* member. Although contractual provisions governing the DRB process suggest that all DRB members must be neutral, pragmatically it is recognized that the two party-appointed members as a matter of appearance are considered *biased* in favor the party who appointed them. The selection process, like tripartite arbitration, necessarily implies by appearance that two of the members may function as *advocates*. Therefore, the established selection process as to the third member is designed to bring objective balance to the panel. (Smith et al., *Dysfunctional ADR: Tips To Avoid the Pain* (1996) 16 Constr.Law. 26, 29; Wight & Lemley, *Dispute Review Boards* (1998) 41 Advocate (Idaho) 14, 15; Acret, Cal. Construction Law Manual (5th ed. 1997) § 3.02, p. 133.) At trial, the DRB chairman confirmed that the underlying rationale for the appointment of the third *impartial* member is the concern that one of the parties may have selected an advocate and the appearance that the member appointed by a party may well be biased in favor of the party who appointed the member.[8]

■ Although the DRB selection process may be appropriate and fair for resolving disputes between the owner and general contractor who are the appointing parties, it does not have the appearance of fairness in the context

---

[8] Within the arbitration context, it is settled law that "[t]here is no requirement that arbitrators appointed by the parties or pursuant to an agreement be neutral or impartial, as long as equal representation is given to each side of the dispute. [Citation.]" (*Painters Dist. Council No. 33 v. Moen* (1982) 128 Cal.App.3d 1032, 1040 [181 Cal.Rptr. 17].)

of a subcontractor's claim against the owner and general contractor. Similar to the adhesive nature of the agreement in *Graham v. Scissor-Tail, Inc., supra,* 28 Cal.3d 807, TBO's purchase order was presented to Sehulster on a take-it-or-leave-it basis. Although Sehulster bid on the purchase order, it had no meaningful opportunity or ability to negotiate the other provisions of its purchase order with TBO or the provisions of the Prime Contract. Under the Prime Contract, the DRB members were appointed and compensated by TBO and City, parties adverse to Sehulster because it was in the interests of both City and TBO that Sehulster's claim be denied. According to City and TBO, Sehulster had no right to appoint, approve or reject any member of the DRB. Although Sehulster requested that it be permitted to select one of the DRB members in an attempt to make the DRB more balanced and impartial, TBO refused. Under these circumstances, the DRB is presumptively aligned with TBO and City and presumptively biased in their favor, excusing Sehulster from any obligation to comply with the DRB process before filing suit. ■ An ADR clause in a contract that excludes one of the parties to a dispute from any voice in the selection of the "neutrals" cannot be enforced; that provision conflicts with our fundamental notions of fairness and tends to defeat ADR's ostensible goals of expeditious and equitable dispute resolution. (*Ditto v. RE/MAX Preferred Properties, Inc.* (Okla.Ct.App. 1993) 861 P.2d 1000, 1003–1004.)

TBO challenges reliance on *Graham v. Scissor-Tail, Inc., supra,* 28 Cal.3d 807 for guidance, asserting it is inapposite because the DRB provisions do not provide for a binding dispute resolution process but simply the issuance of a nonbinding recommendation. We are unpersuaded. Preliminarily, Sehulster in this context should not be required to pursue a charade characterized as meaningful ADR. Secondly, although the DRB's recommendation is nonbinding, it is not without precedential effect and evidentiary influence because the Prime Contract provides for its admissibility into evidence in any later dispute resolution or legal proceeding. Finally, it does not follow that because the DRB process does not constitute binding arbitration, *Graham*'s notions regarding presumptive bias are inapplicable in this context, therefore permitting enforcement of the condition precedent of pursuing the DRB process to preclude resolution of Sehulster's claim by litigation.

In addition, under the terms of the Prime Contract, the DRB process appears similarly biased under these circumstances. For example, DRB members met regularly with TBO and City to discuss matters, including current and potential disputes, claims and other controversies. The process is designed to promote familiarity between the principal contracting parties and the DRB members. The Prime Contract does not provide for DRB meetings with subcontractors. The DRB members can at any time when deemed appropriate, upon approval by TBO and City, change the rules governing the DRB process itself. Sehulster, as a subcontractor and not a party to the Prime

Contract, has no voice in this process. Again, in the context of this case, the potential unfairness of this provision is undeniable. (See *Richards v. Merrill Lynch, Pierce, Fenner & Smith, supra,* 64 Cal.App.3d at pp. 902–904.) Finally, the Prime Contract provides that the DRB proceedings may be transcribed by a court reporter and the DRB's findings and recommendations used against Sehulster in any later dispute resolution or litigation. From Sehulster's perspective, this overall process creates the potential that the DRB proceedings would have been nothing more than an opportunity for TBO and City to orchestrate a ruling in their favor that could later be presented to a trier of fact in support of their position. Requiring the application of the DRB provisions of the Prime Contract to Sehulster's claim would be unconscionable.

B. *The Parties' Motions Pertaining to the May 1997 Release**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

C. *Sehulster's Recovery Against TBO Under an Abandonment of Contract Theory*

Relying on *Amelco Electric v. City of Thousand Oaks, supra,* 27 Cal.4th 228, decided while these appeals were being briefed, TBO asserts that because City cannot be held liable under an abandonment theory on a public works contract,[12] it necessarily follows that TBO cannot be held liable for abandonment under circumstances in which City is required to indemnify it.[13] The Supreme Court in *Amelco Electric* held that the abandonment theory of liability does not apply against a public entity because it is fundamentally inconsistent with the competitive bidding statutory scheme. (*Id.* at pp. 232, 238–242.)[14] Sehulster correctly responds that this holding was limited to

---

* See footnote, *ante,* page 1328.

[12] A construction contract is deemed abandoned if an owner imposes on the contractor an excessive number of changes so it can fairly be declared that the scope of the work under the original contract has been altered. Abandonment requires a determination that both parties intended to disregard the contract. (*Amelco Electric v. City of Thousand Oaks, supra,* 27 Cal.4th at p. 236.) For instance, "[u]nder the abandonment doctrine, once the parties cease to follow the contract's change order process, and the final project has become materially different from the project contracted for, the entire contract—including its notice, documentation, changes, and cost provisions—is deemed inapplicable or abandoned, and the plaintiff may recover the reasonable value for all of its work." (*Id.* at p. 239.)

[13] Sehulster challenges whether TBO can raise this new theory for the first time on appeal. We agree with TBO that its contention is within the rule that new issues may be decided on appeal where they involve pure questions of law based on undisputed facts. (See *Fisher v. City of Berkeley* (1984) 37 Cal.3d 644, 654, fn. 3 [209 Cal.Rptr. 682, 693 P.2d 261].) The issue here is whether a private entity, which is entitled to indemnity from a public agency, can be held liable for abandonment damages when the public agency itself is immune from such damages.

[14] The Supreme Court in *Amelco Electric* declared that were it to conclude that the abandonment theory applied to public works contracts, the notion of competitive bidding

public entities. (*Id.* at pp. 235, 238, 242.) However, TBO counters that it is not asking this court to extend *Amelco Electric* to all private entities, but rather to recognize the narrow corollary that if a public agency is required to indemnify a private entity, it is inappropriate to saddle the private entity with liability in excess of that owed by the public agency. As we shall explain in addressing City's appeal, we conclude City is not required to indemnify TBO under the circumstances presented here. Nevertheless, *Amelco Electric*, its underlying public policy concerns, and the transactional facts here persuade us that although City is a public agency, this fact does not shelter TBO from liability to Sehulster under an abandonment theory.

Preliminarily, *Amelco Electric* as decisional precedent provides TBO little analytical support. The issue presented there was whether the abandonment theory of liability can be asserted against a public agency on a public works contract. Here, TBO's abandonment liability to Sehulster arises from the purchase order agreement between them as private parties. In its ruling, the Supreme Court expressly recognizes the distinction by noting that "[i]n California, the Courts of Appeal have concluded that private parties may impliedly abandon a contract when they fail to follow change order procedures and when the final product differs substantially from the original. [Citations.]" (*Amelco Electric v. City of Thousand Oaks, supra,* 27 Cal.4th at pp. 235–236.) Secondly, TBO's suggestion that it essentially "stands in the shoes" of City on the abandonment claim and that it would be unfair to permit Sehulster to recover against it for abandonment where that recovery could not be obtained from City is unpersuasive. Sehulster's purchase order was with TBO, not City. TBO, not City, was found by the jury to have breached and abandoned *that* agreement. Indeed, TBO could have renegotiated its purchase order with Sehulster, but elected not to and simply imposed the new design on Sehulster without formal changes to the purchase order, thus leading to its abandonment.[15] Finally, and more importantly, the public policy considerations underlying the Supreme Court's decision do not apply

would become meaningless. (*Amelco Electric v. City of Thousand Oaks, supra,* 27 Cal.4th at p. 239.) The court analogized that a contractor operating under an *abandoned* contract is similarly situated to a contractor operating under a void one, and is not entitled to recover against a public entity under the equitable remedy of quantum meruit because it would contravene the public policy underlying statutory competitive bidding requirements. Accordingly, the court concluded that a contractor should similarly be prohibited from recovering under an abandonment theory. It is in this context that the court then stated that neither the doctrine of estoppel *nor any other equitable principle* may be invoked against a public entity if it would operate to defeat the effective operation of a policy promulgated to protect the public. (*Ibid.*) Thus, the Supreme Court held that a contractor could not seek to recover against a public entity if it would defeat the public policies underlying the competitive bidding statutory scheme.

[15] TBO could have delayed executing the purchase order with Sehulster until TBO and City had resolved the redesign issue, which was pending at that time.

in the context of two contracting private entities. The principal basis for the Supreme Court's ruling was that the abandonment theory is fundamentally inconsistent with the underlying purpose of the competitive bidding statutes. That statutory scheme was enacted to benefit property owners and taxpayers, not public works contract bidders, and should be interpreted to serve that purpose fairly and reasonably with sole reference to the public interest. (*Id.* at p. 239.) We agree with Sehulster that it is difficult to imagine how the general public benefits from granting TBO immunity from the abandonment theory. Here, pursuant to a contract between private parties, one private party supplied goods to another, not a public agency, and its damages will be paid from the other private party's profits, not the taxpayers' pockets. There is no reason to extend *Amelco Electric*, even narrowly as suggested by TBO, to a subcontract between private parties even where it is for materials and services destined to be part of the other party's performance under a public works contract.

## II

### CITY'S APPEAL

#### *The Indemnity Judgment Against City*

City, emphasizing TBO did not sue it for breach of the Prime Contract and has never contended that it breached the Prime Contract, contends that as a matter of law TBO has no cause of action for implied contractual indemnity against City, and therefore TBO's judgment against City should be reversed.[16] City explains that although equitable in nature, implied contractual indemnity liability does not arise absent City's breach of the Prime Contract with TBO. City asserts that on the record in this case, as a matter of law, it did not breach the Prime Contract with TBO. City persuasively argues it cannot be held liable for the cost overruns of a subcontractor who is in

---

[16] In its respondent's brief, TBO expressly elected not to address its equitable indemnity theory and instead focuses only on its implied contractual indemnity theory. TBO argues that the implied contractual indemnity theory is fully supported by the evidence and unaffected by error, and requires the indemnity portion of the judgment against City to be affirmed. Because TBO does not support its equitable indemnity theory by any meaningful argument with citation to law or the evidentiary record, it has abandoned that theoretical basis for City's liability; it is equivalent to a concession. (See *Rossiter v. Benoit* (1979) 88 Cal.App.3d 706, 710 [152 Cal.Rptr. 65]; see generally *Sprague v. Equifax, Inc.* (1985) 166 Cal.App.3d 1012, 1050 [213 Cal.Rptr. 69]; *Federer v. County of Sacramento* (1983) 141 Cal.App.3d 184, 186 [190 Cal.Rptr. 187]; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 597, p. 631; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2002) ¶ 9:163, p. 9-42.) Accordingly, we do not address the merits of whether TBO's equitable indemnity theory provides a basis for City's liability.

contractual privity with only the general contractor if, as here, those overruns are caused by design changes requested by the general contractor, who believed the subcontractor's claims were unfounded and agreed the design changes would not affect the price of the Prime Contract. We conclude that under the circumstances presented here City, as a matter of law, did not breach the Prime Contract and cannot be held liable to TBO for implied contractual indemnity.

### 1. *The Tunnel Ring Segments Design Change*

The parties agree that under the Prime Contract, City had design responsibility for the tunnel ring segments.[17] TBO acknowledges that it was responsible for providing a tunnel-boring machine compatible with the original tunnel ring segment design that met all of the performance requirements of the specifications it had at the time of bidding. TBO was responsible for designing and manufacturing the tunnel-boring machine. In July 1995, after learning it was the low bidder, TBO discovered the potential conflict between its design for the tunnel-boring machine and City's design for the tunnel ring segments. TBO discovered that to install the ring segments as designed would require the boring machine to be lengthened, increasing the "skin friction" between it and the tunnel with a resulting risk that the boring machine could become permanently lodged in the tunnel, jeopardizing the entire project. However, TBO advised City of its discovery in late September before City had issued the notice to proceed but after TBO had prematurely ordered the tunnel-boring machine. TBO recommended using an alternative tunnel ring segment design that would avoid lengthening the boring machine. City's engineers did not concur with TBO's assessment, but did agree that the longer shield on the boring machine would increase skin friction and *might* increase the difficulties in advancing the shield. Although TBO asserts that the Prime Contract required it to notify City of design conflicts,[18] it acknowledges it would have cost TBO up to $1 million to lengthen the boring machine. In early October 1995 TBO advised City that if City did not agree with its suggestion of pursuing an alternative tunnel ring segment design, it would immediately start work on an extended length version of the tunnel-boring machine to be compatible with the original ring segment design.

---

[17] Under Article 10 of the General Conditions of the Prime Contract, only City was entitled to change the design of any aspect of the Project, whether at its own request or at the request of TBO. Paragraph 10.1.1 provides that changes in the plans and specifications requested by the contractor that do not materially affect the work and in fact facilitate the work may be approved by City's Construction Manager. Paragraph 10.2.1 governs City's right to modify the work at any time and upon receipt of the written change order the contractor must promptly proceed with the request.

[18] Under Paragraph 3.3.2, TBO was required to advise City through its Construction Manager if it believed there was a problem with the plans and specifications.

TBO's construction manager acknowledged at trial that a tunnel-boring machine could have been designed to be compatible with the original tunnel ring segment design and stringent performance requirements, but he believed that such a machine would increase the risk of failure. For whatever reason—whether it was amiable partnering among contractual parties at the onset of a lengthy contractual relationship or simply risk avoidance—City decided to redesign the tunnel ring segments so they could be installed with the shorter tunnel-boring machine ordered by TBO. Parsons developed the new design in November 1995 and the following month City instructed TBO to proceed with the construction of the redesigned tunnel ring segments. TBO had already entered into the purchase order agreement with Sehulster before City completed its revised ring segment design. On TBO's instruction to Sehulster to manufacture the newly designed rings, Sehulster advised TBO that it would incur additional costs.

Under the Prime Contract, the work change directive does not change the contract price or its terms, but is evidence that the parties expect the change directed or documented by a work change directive will be incorporated into any later-issued change order following the parties' negotiations as to its effect, if any, on the Prime Contract price. Following the May 1997 settlement of Sehulster's first claim arising from the change in ring segment design, City and TBO entered into Field Order No. 13, which expressly provided that it compensates TBO "for all costs to provide for the compatibility of the TBM [tunnel-boring machine] and the precast tunnel lining" and documented that "[TBO] ha[d] agreed that there is no cost impact from the [ring] segment changes."[19] TBO never submitted on its own behalf a change order or field order to City requesting an increase in the contract price as a result of the ring segment change. Rather, it presented to City Sehulster's pass-through claim pursuant to the purchase order agreement and the Prime Contract.

Although City was solely responsible for the tunnel ring segment redesign, TBO requested the redesign, was significantly involved with its preparation, and was primarily responsible for its implementation. Further, because of

---

[19] This reflection of the parties' mutual understanding of the no-cost impact of the redesign on the Prime Contract was made even though the parties had been advised by Sehulster in March 1996 that Sehulster anticipated encountering manufacturing problems as a result of the redesign. Nevertheless, the parties "globally" agreed the redesign would have no cost impact on the Prime Contract. The entire factual matrix surrounding this joint declaration of understanding and its broad wording belie the notion it was narrowly intended to reflect the parties' understanding solely as to the impact of Sehulster's settled claim. Rather, because of the circumstances that led to TBO's request for the design change, especially the estimated cost of modifying its prematurely ordered tunnel-boring machine, the more reasonable inference is that the parties intended their joint declaration to be construed broadly and globally.

TBO's oversight at the bidding stage and premature ordering of the tunnel-boring machine, it sought to persuade City to change its tunnel ring segment design before manufacturing commenced so it could avoid up to $1 million in modification costs to lengthen the tunnel-boring machine. In this context, it can be reasonably inferred that TBO's expressed concern for the potential risk of the tunnel-boring machine becoming lodged in the tunnel was exaggerated, especially considering its expressed willingness to proceed with the boring machine modification and the original ring segment design if City did not agree. Absent *definitive* evidence the original design for the configuration of the tunnel ring segments was unworkable and incorrect, City may have ordered the design change as a "good partner," not anticipating that the redesign would increase the cost of manufacturing the tunnel ring segments.

TBO's acquiescence in Field Order No. 13 is understandable, considering it was contractually responsible for designing and providing a tunnel-boring machine compatible with the Prime Contract performance specifications and the original tunnel ring segment design. As the prevailing bidder, TBO agreed to build the entire project for slightly more than $88 million consistent with the original plans and specifications—a bid that presumably included a profit margin. Consequently, by avoiding any modification costs to the tunnel-boring machine it had prematurely ordered, it can be reasonably inferred TBO in exchange for the redesign was willing to assume any potential liability for cost overruns caused by the design change incurred by Sehulster, with whom it had entered into the purchase order agreement before City completed the redesign.

### 2. Sehulster's Claim

Under the circumstances presented here, there is no contract between City and subcontractor Sehulster, and Sehulster cannot sue City directly because there is no privity of contract between them. (*Howard Contracting, Inc. v. G. A. MacDonald Construction Co.* (1998) 71 Cal.App.4th 38, 60 [83 Cal.Rptr.2d 590].) ■ However, California law protects the interests of the subcontractor by providing that a subcontractor's claim "passes through" the general contractor to the owner. (See *D. A. Parrish & Sons v. County Sanitation Dist.* (1959) 174 Cal.App.2d 406, 415–416 [344 P.2d 883] [General contractor claimed damages against public entity on the theory that the public entity's breach of contract resulted in the general contractor incurring liability to its subcontractors. The court held subcontractors were properly joined because to the extent the general contractor was liable to them, the public entity was liable to the general contractor.].) Consequently, by contract or settlement agreement, a general contractor and a subcontractor can agree that the contractor will pass through the subcontractor's claims against the contractor to the owner. (See *Howard Contracting, Inc. v. G. A. MacDonald*

*Construction Co., supra,* 71 Cal.App.4th at pp. 58–59.) "As a matter of law, a general contractor can present a subcontractor's claim on a pass-through basis. [Citation.] When a public agency breaches a construction contract with a contractor, damage often ensues to a subcontractor. In such a situation, the subcontractor may not have legal standing to assert a claim directly against the public agency due to a lack of privity of contract, but may assert a claim against the general contractor. In such a case, a general contractor is permitted to present a pass-through claim on behalf of the subcontractor against the public agency. [Citation.]" (*Id.* at p. 60.) The pass-through process and such agreements are designed to shorten the legal process by not requiring the subcontractor to first sue the general contractor and the latter to actually pay damages to the former before suing the owner.

The purchase order agreement between Sehulster and TBO and the Prime Contract between TBO and City contemplated the pass-through process should a dispute arise between Sehulster and TBO for which City may be responsible. Under the purchase order agreement, TBO was required to present to City Sehulster's claim should Sehulster invoke the contractual pass-through provisions. It did so and TBO passed through the claim as a "request for change." Under the Prime Contract, City required TBO to certify the claim; however, by doing so, TBO simply met its contractual obligations to pass through Sehulster's claim. It did not agree to the underlying merit of Sehulster's claims. Rather, consistent with the nature of the process, TBO acted as a conduit between Sehulster and City as long as Sehulster continued to pursue its claim against TBO.[20]

The record clearly shows that all parties were fully aware that it was Sehulster's claim TBO was passing through. TBO, like City, believed Sehulster's claim to be meritless. Consequently, TBO neither challenged City's rejection of its pass-through request nor sued City for breach of contract. To TBO, City's design changes at TBO's request did not require a change in the total price of the Prime Contract. Field Order No. 13 reflects the understanding of both TBO and City that the redesign would have no impact on the negotiated price of the Prime Contract. Nevertheless, as a precautionary

---

[20] The first paragraph in Article 11 of the Prime Contract governing change of contract price provides that it can be changed only by a written change order. Where the change is made and City or the parties have not resolved its effect on the contract price, Article 16 governing disputes comes into play. Paragraph 16.2.1 authorizes TBO to request a change in the contract price. That occurred here when TBO made the request on behalf of Sehulster. Under Paragraph 16.2.2, the Construction Manager makes an initial determination on the request. Again, that occurred here. In the context of a pass-through claim, if the subcontractor disagrees with the Construction Manager's initial determination, the contractor on behalf of the subcontractor may file a claim requesting a final determination. That occurred here as well. Finally, if the parties still disagree, Paragraph 16.4.2.1 requires the contractor to submit a written request for a DRB hearing, which occurred here, but Sehulster later refused to participate in the DRB procedure.

measure in response to Sehulster's action against TBO, TBO cross-complained against City for implied contractual indemnity should Sehulster prevail against TBO on its claim.

City characterizes Sehulster's pass-through claim in effect as TBO's claim, and contends that TBO had the option of contesting City's decision denying the claim and asserting it was entitled to receive the additional $2,545,000 for breach of contract. City points out that had TBO done so, it would have been required under section 16.4.2.1 of the Prime Contract to submit "its" claim to the DRB. Instead, City contends that TBO *agreed* that the claim lacked merit and thus *admitted* it did not have a viable claim against City for breach of contract. TBO did not present "its own claim" against City, and City is correct that TBO agreed the design changes would not affect the negotiated price of the Prime Contract and that Sehulster's claim was unfounded.

### 3. *Implied Contractual Indemnity*

■ Implied contractual indemnity is a form of equitable indemnity, arising from equitable considerations either by contractual language not specifically dealing with indemnification or by the equities of the specific matter. (*Bay Development, Ltd. v. Superior Court* (1990) 50 Cal.3d 1012, 1029 [269 Cal.Rptr. 720, 791 P.2d 290]; *E. L. White v. City of Huntington Beach* (1978) 21 Cal.3d 497, 506–507 [146 Cal.Rptr. 614, 579 P.2d 505].) "The right to implied contractual indemnity is predicated [on] the indemnitor's breach of contract ...." (*West v. Superior Court* (1994) 27 Cal.App.4th 1625, 1633 [34 Cal.Rptr.2d 409]; see *Cahill Bros., Inc. v. Clementina Co.* (1962) 208 Cal.App.2d 367, 379 [25 Cal.Rptr. 301].) Here, TBO asserts that under the Prime Contract City assumed certain obligations that necessarily implied an obligation to perform those responsibilities in a proper manner and to discharge foreseeable damages resulting from improper performance absent any participation by TBO in the wrongful conduct that would preclude recovery. (See *West v. Superior Court, supra,* 27 Cal.App.4th at p. 1633.) "Implied contractual indemnity is applied to contract parties and is designed to apportion loss among contract parties based on the concept that one who enters a contract agrees to perform the work carefully and to discharge foreseeable damages resulting from that breach. [Citation.]" (*Smoketree-Lake Murray, Ltd. v. Mills Concrete Construction Co.* (1991) 234 Cal.App.3d 1724, 1736 [286 Cal.Rptr. 435].) ■ As a form of equitable indemnity (*Ranchwood Communities Limited Partnership v. Jim Beat Construction Co.* (1996) 49 Cal.App.4th 1397, 1416 [57 Cal.Rptr.2d 386]), the doctrine rests on the equities apparent from the surrounding circumstances, because contracting parties should share loss in proportion to their breach. (*Smoketree-Lake Murray, Ltd. v. Mills Concrete Construction Co., supra,* 234 Cal.App.3d

at pp. 1736–1737.) An implied contractual indemnity action does not amount to a claim for contribution from a joint tortfeasor because it is founded neither in tort nor on any duty that the indemnitor owes to the injured party. Rather, it is predicated on the indemnitor's breach of duty owing to the indemnitee to properly perform its contractual responsibilities. (*West v. Superior Court, supra*, 27 Cal.App.4th at p. 1633.)

### 4. *Analysis*

Here, TBO cannot assert a cause of action for implied contractual indemnity against City because City did not breach any provision of the Prime Contract or any duty owed to TBO to properly perform its contractual responsibilities. The parties' briefing and analysis of the jury's findings persuade us the jury's indemnity award was predicated on a determination that City breached the Prime Contract. Therefore, City was liable to TBO for Sehulster's cost overruns on a pass-through basis under the Prime Contract for extra work it ordered as a result of directing TBO, and thus Sehulster, to manufacture the tunnel ring segments in accordance with the redesign. However, we conclude there is insufficient evidence to support a finding that City breached the Prime Contract.[21] City had the contractual right to grant TBO's request for a tunnel ring segment design change. In Field Order No. 13, the parties globally agreed that the design changes requested by TBO did not affect the originally negotiated price of the Prime Contract, even though Sehulster had warned them it anticipated encountering manufacturing problems as a result of the redesign. In doing so, TBO assumed any potential liability for cost overruns by its subcontractor Sehulster in manufacturing the tunnel ring segments in accordance with the redesign. TBO's Underground Division Manager, George Williamson, confirmed at trial that City had paid TBO in full the Prime Contract price for building the Project.

TBO suggests that its implied contractual indemnity recovery against City is based on contractual provisions for recovering the cost of extra work ordered by City as a result of the redesign of the tunnel ring segments. However, TBO and City agreed the redesign would have no cost impact on the Prime Contract. TBO thus agreed it would be responsible for any additional work performed as a result of the redesign TBO requested. TBO's

---

[21] If a trier of fact's finding is challenged on the ground there is no substantial evidence to sustain it, the appellate court reviews the entire record to determine whether there is substantial evidence, contradicted or uncontradicted, that will support the trier of fact's determination. Here, we view the evidence most favorably to TBO, the prevailing party on its indemnity claim against City, resolving all evidentiary conflicts in TBO's favor and indulging all reasonable inferences possible to uphold the jury's findings. However, where the decisive facts are undisputed, the reviewing court is confronted with a question of law and is not bound by the jury's findings. (*San Diego Metropolitan Transit Development Bd. v. Handlery Hotel, Inc.* (1999) 73 Cal.App.4th 517, 528 [86 Cal.Rptr.2d 473].)

claim does not rest on City's obligation under the Prime Contract to pay for extra work it ordered TBO, and thus Sehulster, to perform as a result of its implementation of postcontract design changes. Rather, TBO's claim rests on cost overruns incurred by Sehulster in performing its purchase order agreement with TBO that were the result of design changes TBO requested City make. TBO agreed expressly in Field Order No. 13, and impliedly by its conduct in not seeking any price modification pursuant to the governing provisions of the Prime Contract, that these cost overruns would not change the price of the Prime Contract. Consequently, City's denial of Sehulster's pass-through claim does not constitute a breach of the Prime Contract and the jury's implied finding to the contrary is not supported by substantial evidence. TBO remains liable for Sehulster's cited cost overruns under their purchase order agreement.

■ Additionally, Public Contract Code section 7105, subdivision (d)(2) provides that a public works contract that must be awarded by competitive bid may be amended or modified only if it is so provided in the contract or authorized by law. The section expressly states: "The compensation payable, if any, for amendments and modifications shall be determined as provided in the contract." TBO requested City to implement the design changes and later agreed they would have no impact on the Prime Contract price. On its own behalf under the provisions of the Prime Contract, TBO never requested the originally negotiated price be modified as a result of the redesign. The Prime Contract is without any indemnity provision that would require City to indemnify TBO for its liability for Sehulster's cost overruns occasioned by the redesign. To permit TBO to recover here under the theory of implied contractual indemnity would be inconsistent with the cited public policy reflected in Public Contract Code section 7105.[22]

## DISPOSITION

The judgment is reversed in part as to City's liability to TBO for indemnity. In all other respects, the judgment is affirmed. Sehulster is entitled to costs on appeal. TBO and City shall bear their own costs on appeal.

Huffman, J., and McDonald, J., concurred.

---

[22] Because of our conclusion that TBO is not entitled to implied contractual indemnity from City, it is unnecessary to address whether permitting TBO to recover under the theory of implied contractual indemnity implicates the public policy considerations recognized in *Amelco Electric v. City of Thousand Oaks, supra,* 27 Cal.4th 228, that preclude a contractor from recovering additional compensation from a governmental entity on a public works contract if it would defeat the policies to protect the public underlying the competitive bidding statutes.

Further, we note that the parties proffered no authority specifically addressing whether a public entity in this context can be held liable under an implied contractual indemnity claim to a general contractor on a public works contract.